COUNTY OF SACRAMENTO ET AL. *v.* LEWIS, ET AL.,
PERSONAL REPRESENTATIVES OF THE ESTATE
OF LEWIS, DECEASED

No. 96–1337.   Argued December 9, 1997—Decided May 26, 1998

834

SOUTER, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and O'CONNOR, KENNEDY, GINSBURG, and BREYER, JJ., joined. REHNQUIST, C. J., filed a concurring opinion, *post*, p. 855. KENNEDY, J., filed a concurring opinion, in which O'CONNOR, J., joined, *post*, p. 856. BREYER, J., filed a concurring opinion, *post*, p. 858. STEVENS, J., filed an opinion concurring in the judgment, *post*, p. 859. SCALIA, J., filed an opinion concurring in the judgment, in which THOMAS, J., joined, *post*, p. 860.

*Terence J. Cassidy* argued the cause and filed briefs for petitioners.

*Paul J. Hedlund* argued the cause for respondents. With him on the brief was *Michael L. Baum.**

---

*Briefs of *amici curiae* urging reversal were filed for the State of Alaska et al. by *Daniel E. Lungren,* Attorney General of California, *Margaret A. Rodda,* Senior Assistant Attorney General, *Darryl L. Doke,* Supervising Deputy Attorney General, and *Stephen J. Egan,* Deputy Attorney General, joined by the Attorneys General for their respective States as follows: *Bruce M. Botelho* of Alaska, *Grant Woods* of Arizona, *Margery S. Bronster* of Hawaii, *Alan G. Lance* of Idaho, *Thomas J. Miller* of Iowa, *Michael E. Carpenter* of Maine, *Scott Harshbarger* of Massachusetts, *Frank J. Kelley* of Michigan, *Hubert H. Humphrey III* of Minnesota, *Jeremiah W. (Jay) Nixon* of Missouri, *Joseph P. Mazurek* of Montana, *Don Stenberg* of Nebraska, *Frankie Sue Del Papa* of Nevada, *Dennis C. Vacco* of New York, *Heidi Heitkamp* of North Dakota, *D. Michael Fisher* of Pennsylvania, *Mark W. Barnett* of South Dakota, *Jan Graham* of Utah, *Richard Cullen* of Virginia, *Darrell V. McGraw, Jr.,* of West Virginia, *James E. Doyle* of Wisconsin, and *William U. Hill* of Wyoming; for the City and County of Denver by *Theodore S. Halaby;* for the County of Riverside et al. by *William C. Katzenstein, James K. Hahn, Gregory*

JUSTICE SOUTER delivered the opinion of the Court.

The issue in this case is whether a police officer violates the Fourteenth Amendment's guarantee of substantive due process by causing death through deliberate or reckless indifference to life in a high-speed automobile chase aimed at apprehending a suspected offender. We answer no, and hold that in such circumstances only a purpose to cause harm unrelated to the legitimate object of arrest will satisfy the element of arbitrary conduct shocking to the conscience, necessary for a due process violation.

## I

On May 22, 1990, at approximately 8:30 p.m., petitioner James Everett Smith, a Sacramento County sheriff's deputy, along with another officer, Murray Stapp, responded to a call to break up a fight. Upon returning to his patrol car, Stapp saw a motorcycle approaching at high speed. It was operated by 18-year-old Brian Willard and carried Philip Lewis, respondents' 16-year-old decedent, as a passenger. Neither boy had anything to do with the fight that prompted the call to the police.

Stapp turned on his overhead rotating lights, yelled to the boys to stop, and pulled his patrol car closer to Smith's, attempting to pen the motorcycle in. Instead of pulling over in response to Stapp's warning lights and commands, Willard

P. Orland, Timothy T. Coates, H. Peter Klein, Alan K. Marks, James B. Lindholm, Jr., Steven M. Woodside, James Rumble, and James P. Botz; for the Grand Lodge of the Fraternal Order of Police by Gary Lightman, Thomas T. Rutherford, and William J. Friedman; for the National Association of Counties et al. by Richard Ruda and Charles Rothfeld; and for the Criminal Justice Legal Foundation by Kent S. Scheidegger.

Briefs of amici curiae urging affirmance were filed for the Association of Trial Lawyers of America by Howard A. Friedman and Richard D. Haley; for Gabriel Torres et al. by Stephen Yagman and Marion R. Yagman; and for Solutions to the Tragedies of Police Pursuits (STOPP) by Andrew C. Clarke.

slowly maneuvered the motorcycle between the two police cars and sped off. Smith immediately switched on his own emergency lights and siren, made a quick turn, and began pursuit at high speed. For 75 seconds over a course of 1.3 miles in a residential neighborhood, the motorcycle wove in and out of oncoming traffic, forcing two cars and a bicycle to swerve off the road. The motorcycle and patrol car reached speeds up to 100 miles an hour, with Smith following at a distance as short as 100 feet; at that speed, his car would have required 650 feet to stop.

The chase ended after the motorcycle tipped over as Willard tried a sharp left turn. By the time Smith slammed on his brakes, Willard was out of the way, but Lewis was not. The patrol car skidded into him at 40 miles an hour, propelling him some 70 feet down the road and inflicting massive injuries. Lewis was pronounced dead at the scene.

Respondents, Philip Lewis's parents and the representatives of his estate, brought this action under Rev. Stat. § 1979, 42 U. S. C. § 1983, against petitioners Sacramento County, the Sacramento County Sheriff's Department, and Deputy Smith, alleging a deprivation of Philip Lewis's Fourteenth Amendment substantive due process right to life.[1] The District Court granted summary judgment for Smith, reasoning that even if he violated the Constitution, he was entitled to qualified immunity, because respondents could point to no "state or federal opinion published before May, 1990, when the alleged misconduct took place, that supports

---

[1] Respondents also brought claims under state law. The District Court found that Smith was immune from state tort liability by operation of California Vehicle Code § 17004, which provides that "[a] public employee is not liable for civil damages on account of personal injury to or death of any person or damage to property resulting from the operation, in the line of duty, of an authorized emergency vehicle . . . when in the immediate pursuit of an actual or suspected violator of the law." Cal. Veh. Code Ann. § 17004 (West 1971). The court declined to rule on the potential liability of the county under state law, instead dismissing the tort claims against the county without prejudice to refiling in state court.

[their] view that [the decedent had] a Fourteenth Amendment substantive due process right in the context of high speed police pursuits." App. to Pet. for Cert. 52.[2]

The Court of Appeals for the Ninth Circuit reversed, holding that "the appropriate degree of fault to be applied to high-speed police pursuits is deliberate indifference to, or reckless disregard for, a person's right to life and personal security," 98 F. 3d 434, 441 (1996), and concluding that "the law regarding police liability for death or injury caused by an officer during the course of a high-speed chase was clearly established" at the time of Philip Lewis's death, id., at 445. Since Smith apparently disregarded the Sacramento County Sheriff's Department's General Order on police pursuits, the Ninth Circuit found a genuine issue of material fact that might be resolved by a finding that Smith's conduct amounted to deliberate indifference:

> "The General Order requires an officer to communicate his intention to pursue a vehicle to the sheriff's department dispatch center. But defendants concede that Smith did not contact the dispatch center. The General Order requires an officer to consider whether the seriousness of the offense warrants a chase at speeds in excess of the posted limit. But here, the only apparent 'offense' was the boys' refusal to stop when another officer told them to do so. The General Order requires an officer to consider whether the need for apprehen-

---

[2] The District Court also granted summary judgment in favor of the county and the Sheriff's Department on the § 1983 claim, concluding that municipal liability would not lie under Monell v. New York City Dept. of Social Servs., 436 U. S. 658 (1978), after finding no genuine factual dispute as to whether the county adequately trains its officers in the conduct of vehicular pursuits or whether the pursuit policy of the Sheriff's Department evinces deliberate indifference to the constitutional rights of the public. The Ninth Circuit affirmed the District Court on these points, 98 F. 3d 434, 446–447 (1996), and the issue of municipal liability is not before us.

sion justifies the pursuit under existing conditions. Yet Smith apparently only 'needed' to apprehend the boys because they refused to stop. The General Order requires an officer to consider whether the pursuit presents unreasonable hazards to life and property. But taking the facts here in the light most favorable to plaintiffs, there existed an unreasonable hazard to Lewis's and Willard's lives. The General Order also directs an officer to discontinue a pursuit when the hazards of continuing outweigh the benefits of immediate apprehension. But here, there was no apparent danger involved in permitting the boys to escape. There certainly was risk of harm to others in continuing the pursuit." *Id.*, at 442.

Accordingly, the Court of Appeals reversed the summary judgment in favor of Smith and remanded for trial.

We granted certiorari, 520 U. S. 1250 (1997), to resolve a conflict among the Circuits over the standard of culpability on the part of a law enforcement officer for violating substantive due process in a pursuit case. Compare 98 F. 3d, at 441 ("deliberate indifference" or "reckless disregard"),[3] with *Evans* v. *Avery*, 100 F. 3d 1033, 1038 (CA1 1996) ("shocks the conscience"), cert. denied, 520 U. S. 1210 (1997); *Williams* v. *Denver*, 99 F. 3d 1009, 1014–1015 (CA10 1996) (same); *Fagan* v. *Vineland*, 22 F. 3d 1296, 1306–1307 (CA3 1994) (en banc) (same); *Temkin* v. *Frederick County Commissioners*, 945

---

[3] In *Jones* v. *Sherrill*, 827 F. 2d 1102, 1106 (1987), the Sixth Circuit adopted a "gross negligence" standard for imposing liability for harm caused by police pursuit. Subsequently, in *Foy* v. *Berea*, 58 F. 3d 227, 230 (1995), the Sixth Circuit, without specifically mentioning *Jones*, disavowed the notion that "gross negligence is sufficient to support a substantive due process claim." Although *Foy* involved police inaction, rather than police pursuit, it seems likely that the Sixth Circuit would now apply the "deliberate indifference" standard utilized in that case, see 58 F. 3d, at 232–233, rather than the "gross negligence" standard adopted in *Jones*, in a police pursuit situation.

F. 2d 716, 720 (CA4 1991) (same), cert. denied, 502 U. S. 1095 (1992); and *Checki* v. *Webb*, 785 F. 2d 534, 538 (CA5 1986) (same). We now reverse.

## II

Our prior cases have held the provision that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law," U. S. Const., Amdt. 14, § 1, to "guarante[e] more than fair process," *Washington* v. *Glucksberg*, 521 U. S. 702, 719 (1997), and to cover a substantive sphere as well, "barring certain government actions regardless of the fairness of the procedures used to implement them," *Daniels* v. *Williams*, 474 U. S. 327, 331 (1986); see also *Zinermon* v. *Burch*, 494 U. S. 113, 125 (1990) (noting that substantive due process violations are actionable under § 1983). The allegation here that Lewis was deprived of his right to life in violation of substantive due process amounts to such a claim, that under the circumstances described earlier, Smith's actions in causing Lewis's death were an abuse of executive power so clearly unjustified by any legitimate objective of law enforcement as to be barred by the Fourteenth Amendment. Cf. *Collins* v. *Harker Heights*, 503 U. S. 115, 126 (1992) (noting that the Due Process Clause was intended to prevent government officials " ' "from abusing [their] power, or employing it as an instrument of oppression" ' ") (quoting *DeShaney* v. *Winnebago County Dept. of Social Servs.,* 489 U. S. 189, 196 (1989), in turn quoting *Davidson* v. *Cannon*, 474 U. S. 344, 348 (1986)).[4]

---

[4] Respondents do not argue that they were denied due process of law by virtue of the fact that California's postdeprivation procedures and rules of immunity have effectively denied them an adequate opportunity to seek compensation for the state-occasioned deprivation of their son's life. We express no opinion here on the merits of such a claim, cf. *Albright* v. *Oliver*, 510 U. S. 266, 281–286 (1994) (KENNEDY, J., concurring in judgment); *Parratt* v. *Taylor*, 451 U. S. 527 (1981), or on the adequacy of California's postdeprivation compensation scheme.

Leaving aside the question of qualified immunity, which formed the basis for the District Court's dismissal of their case,[5] respondents face two principal objections to their

_____

[5] As in any action under § 1983, the first step is to identify the exact contours of the underlying right said to have been violated. See *Graham* v. *Connor*, 490 U. S. 386, 394 (1989). The District Court granted summary judgment to Smith on the basis of qualified immunity, assuming without deciding that a substantive due process violation took place but holding that the law was not clearly established in 1990 so as to justify imposition of § 1983 liability. We do not analyze this case in a similar fashion because, as we have held, the better approach to resolving cases in which the defense of qualified immunity is raised is to determine first whether the plaintiff has alleged a deprivation of a constitutional right at all. Normally, it is only then that a court should ask whether the right allegedly implicated was clearly established at the time of the events in question. See *Siegert* v. *Gilley*, 500 U. S. 226, 232 (1991) ("A necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is 'clearly established' at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all," and courts should not "assum[e], without deciding, this preliminary issue").

JUSTICE STEVENS suggests that the rule of *Siegert* should not apply where, as here, the constitutional question presented "is both difficult and unresolved." *Post*, at 859. But the generally sound rule of avoiding determination of constitutional issues does not readily fit the situation presented here; when liability is claimed on the basis of a constitutional violation, even a finding of qualified immunity requires some determination about the state of constitutional law at the time the officer acted. What is more significant is that if the policy of avoidance were always followed in favor of ruling on qualified immunity whenever there was no clearly settled constitutional rule of primary conduct, standards of official conduct would tend to remain uncertain, to the detriment both of officials and individuals. An immunity determination, with nothing more, provides no clear standard, constitutional or nonconstitutional. In practical terms, escape from uncertainty would require the issue to arise in a suit to enjoin future conduct, in an action against a municipality, or in litigating a suppression motion in a criminal proceeding; in none of these instances would qualified immunity be available to block a determination of law. See Shapiro, Public Officials' Qualified Immunity in Section 1983 Actions Under *Harlow* v. *Fitzgerald* and its Progeny, 22 U. Mich. J. L. Ref. 249, 265, n. 109 (1989). But these avenues would not necessarily be open, and therefore

claim. The first is that its subject is necessarily governed by a more definite provision of the Constitution (to the exclusion of any possible application of substantive due process); the second, that in any event the allegations are insufficient to state a substantive due process violation through executive abuse of power. Respondents can meet the first objection, but not the second.

## A

Because we have "always been reluctant to expand the concept of substantive due process," *Collins* v. *Harker Heights, supra,* at 125, we held in *Graham* v. *Connor,* 490 U. S. 386 (1989), that "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Albright* v. *Oliver,* 510 U. S. 266, 273 (1994) (plurality opinion of REHNQUIST, C. J.) (quoting *Graham* v. *Connor, supra,* at 395) (internal quotation marks omitted). Given the rule in *Graham,* we were presented at oral argument with the threshold issue raised in several *amicus* briefs,[6] whether facts involving a police chase aimed at apprehending suspects can ever support a due process claim. The argument runs that in chasing the motorcycle, Smith was attempting to make a seizure within the meaning of the Fourth Amendment, and, perhaps, even that he succeeded when Lewis was stopped by the fatal collision. Hence, any liability must turn on an application of the reasonableness stand-

---

the better approach is to determine the right before determining whether it was previously established with clarity.

[6] See Brief for National Association of Counties et al. as *Amici Curiae* 8–13; Brief for Grand Lodge of the Fraternal Order of Police as *Amicus Curiae* 4–9; Brief for City and County of Denver, Colorado, as *Amici Curiae* 2–7; Brief for County of Riverside et al. as *Amici Curiae* 6–18; Brief for Gabriel Torres et al. as *Amici Curiae* 3–11.

ard governing searches and seizures, not the due process standard of liability for constitutionally arbitrary executive action. See *Graham* v. *Connor, supra,* at 395 ("*[A]ll* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach" (emphasis in original)); *Albright* v. *Oliver,* 510 U. S., at 276 (GINSBURG, J., concurring); *id.,* at 288, n. 2 (SOUTER, J., concurring in judgment). One Court of Appeals has indeed applied the rule of *Graham* to preclude the application of principles of generalized substantive due process to a motor vehicle passenger's claims for injury resulting from reckless police pursuit. See *Mays* v. *East St. Louis,* 123 F. 3d 999, 1002–1003 (CA7 1997).

The argument is unsound. Just last Term, we explained that *Graham*

> "does not hold that all constitutional claims relating to physically abusive government conduct must arise under either the Fourth or Eighth Amendments; rather, *Graham* simply requires that if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *United States* v. *Lanier,* 520 U. S. 259, 272, n. 7 (1997).

Substantive due process analysis is therefore inappropriate in this case only if respondents' claim is "covered by" the Fourth Amendment. It is not.

The Fourth Amendment covers only "searches and seizures," neither of which took place here. No one suggests that there was a search, and our cases foreclose finding a seizure. We held in *California* v. *Hodari D.,* 499 U. S. 621,

626 (1991), that a police pursuit in attempting to seize a person does not amount to a "seizure" within the meaning of the Fourth Amendment. And in *Brower* v. *County of Inyo,* 489 U. S. 593, 596–597 (1989), we explained that "a Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement (the innocent passerby), nor even whenever there is a governmentally caused and governmentally *desired* termination of an individual's freedom of movement (the fleeing felon), but only when there is a governmental termination of freedom of movement *through means intentionally applied."* We illustrated the point by saying that no Fourth Amendment seizure would take place where a "pursuing police car sought to stop the suspect only by the show of authority represented by flashing lights and continuing pursuit," but accidentally stopped the suspect by crashing into him. *Id.,* at 597. That is exactly this case. See, *e. g., Campbell* v. *White,* 916 F. 2d 421, 423 (CA7 1990) (following *Brower* and finding no seizure where a police officer accidentally struck and killed a fleeing motorcyclist during a high-speed pursuit), cert. denied, 499 U. S. 922 (1991). *Graham*'s more-specific-provision rule is therefore no bar to respondents' suit. See, *e. g., Frye* v. *Akron,* 759 F. Supp. 1320, 1324 (ND Ind. 1991) (parents of a motorcyclist who was struck and killed by a police car during a high-speed pursuit could sue under substantive due process because no Fourth Amendment seizure took place); *Evans* v. *Avery,* 100 F. 3d, at 1036 (noting that "outside the context of a seizure, . . . a person injured as a result of police misconduct may prosecute a substantive due process claim under section 1983"); *Pleasant* v. *Zamieski,* 895 F. 2d 272, 276, n. 2 (CA6) (noting that *Graham* "preserve[s] fourteenth amendment substantive due process analysis for those instances in which a free citizen is denied his or her constitutional right to life through means other than a law enforcement official's arrest, investi-

gatory stop or other seizure"), cert. denied, 498 U. S. 851 (1990).[7]

## B

Since the time of our early explanations of due process, we have understood the core of the concept to be protection against arbitrary action:

> "The principal and true meaning of the phrase has never been more tersely or accurately stated than by Mr. Justice Johnson, in *Bank of Columbia* v. *Okely,* 4 Wheat. 235–244 [(1819)]: 'As to the words from Magna Charta, incorporated into the Constitution of Maryland, after volumes spoken and written with a view to their exposition, the good sense of mankind has at last settled down to this: that they were intended to secure the individual from the arbitrary exercise of the powers of government, unrestrained by the established principles of private right and distributive justice.'" *Hurtado* v. *California,* 110 U. S. 516, 527 (1884).

We have emphasized time and again that "[t]he touchstone of due process is protection of the individual against arbitrary action of government," *Wolff* v. *McDonnell,* 418 U. S. 539, 558 (1974), whether the fault lies in a denial of funda-

---

[7] Several *amici* suggest that, for the purposes of *Graham,* the Fourth Amendment should cover not only seizures, but also failed attempts to make a seizure. See, *e. g.,* Brief for National Association of Counties et al. as *Amici Curiae* 10–11. This argument is foreclosed by *California* v. *Hodari D.,* 499 U. S. 621 (1991), in which we explained that "neither usage nor common-law tradition makes an *attempted* seizure a seizure. The common law may have made an attempted seizure unlawful in certain circumstances; but it made many things unlawful, very few of which were elevated to constitutional proscriptions." *Id.,* at 626, n. 2. Attempted seizures of a person are beyond the scope of the Fourth Amendment. See *id.,* at 646 (STEVENS, J., dissenting) (disagreeing with the Court's position that "an attempt to make [a] . . . seizure is beyond the coverage of the Fourth Amendment").

mental procedural fairness, see, *e. g.*, *Fuentes* v. *Shevin*, 407 U. S. 67, 82 (1972) (the procedural due process guarantee protects against "arbitrary takings"), or in the exercise of power without any reasonable justification in the service of a legitimate governmental objective, see, *e. g.*, *Daniels* v. *Williams*, 474 U. S., at 331 (the substantive due process guarantee protects against government power arbitrarily and oppressively exercised). While due process protection in the substantive sense limits what the government may do in both its legislative, see, *e. g.*, *Griswold* v. *Connecticut*, 381 U. S. 479 (1965), and its executive capacities, see, *e. g.*, *Rochin* v. *California*, 342 U. S. 165 (1952), criteria to identify what is fatally arbitrary differ depending on whether it is legislation or a specific act of a governmental officer that is at issue.

Our cases dealing with abusive executive action have repeatedly emphasized that only the most egregious official conduct can be said to be "arbitrary in the constitutional sense," *Collins* v. *Harker Heights*, 503 U. S., at 129, thereby recognizing the point made in different circumstances by Chief Justice Marshall, "'that it is *a constitution* we are expounding,'" *Daniels* v. *Williams*, *supra*, at 332 (quoting *McCulloch* v. *Maryland*, 4 Wheat. 316, 407 (1819) (emphasis in original)). Thus, in *Collins* v. *Harker Heights*, for example, we said that the Due Process Clause was intended to prevent government officials "'"from abusing [their] power, or employing it as an instrument of oppression."'" 503 U. S., at 126 (quoting *DeShaney* v. *Winnebago County Dept. of Social Servs.*, 489 U. S., at 196, in turn quoting *Davidson* v. *Cannon*, 474 U. S., at 348).

To this end, for half a century now we have spoken of the cognizable level of executive abuse of power as that which shocks the conscience. We first put the test this way in *Rochin* v. *California*, *supra*, at 172–173, where we found the forced pumping of a suspect's stomach enough to offend due process as conduct "that shocks the conscience" and violates the "decencies of civilized conduct." In the intervening

years we have repeatedly adhered to *Rochin*'s benchmark. See, *e. g.*, *Breithaupt* v. *Abram*, 352 U. S. 432, 435 (1957) (reiterating that conduct that " 'shocked the conscience' and was so 'brutal' and 'offensive' that it did not comport with traditional ideas of fair play and decency" would violate substantive due process); *Whitley* v. *Albers*, 475 U. S. 312, 327 (1986) (same); *United States* v. *Salerno*, 481 U. S. 739, 746 (1987) ("So-called 'substantive due process' prevents the government from engaging in conduct that 'shocks the conscience,' . . . or interferes with rights 'implicit in the concept of ordered liberty' ") (quoting *Rochin* v. *California*, *supra*, at 172, and *Palko* v. *Connecticut*, 302 U. S. 319, 325–326 (1937)). Most recently, in *Collins* v. *Harker Heights*, *supra*, at 128, we said again that the substantive component of the Due Process Clause is violated by executive action only when it "can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense." While the measure of what is conscience shocking is no calibrated yard stick, it does, as Judge Friendly put it, "poin[t] the way." *Johnson* v. *Glick*, 481 F. 2d 1028, 1033 (CA2), cert. denied, 414 U. S. 1033 (1973).[8]

---

[8] As JUSTICE SCALIA has explained before, he fails to see "the usefulness of 'conscience shocking' as a legal test," *Herrera* v. *Collins*, 506 U. S. 390, 428 (1993), and his independent analysis of this case is therefore understandable. He is, however, simply mistaken in seeing our insistence on the shocks-the-conscience standard as an atavistic return to a scheme of due process analysis rejected by the Court in *Washington* v. *Glucksberg*, 521 U. S. 702 (1997).

*Glucksberg* presented a disagreement about the significance of historical examples of protected liberty in determining whether a given statute could be judged to contravene the Fourteenth Amendment. The differences of opinion turned on the issues of how much history indicating recognition of the asserted right, viewed at what level of specificity, is necessary to support the finding of a substantive due process right entitled to prevail over state legislation.

As we explain in the text, a case challenging executive action on substantive due process grounds, like this one, presents an issue antecedent to any question about the need for historical examples of enforcing a lib-

It should not be surprising that the constitutional concept of conscience shocking duplicates no traditional category of common-law fault, but rather points clearly away from liability, or clearly toward it, only at the ends of the tort law's spectrum of culpability. Thus, we have made it clear that the due process guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm. In *Paul* v. *Davis*, 424 U. S. 693, 701 (1976), for example, we explained that the Fourteenth Amendment is not a "font of tort law to be superimposed upon whatever systems may already be administered by the States," and in *Daniels* v. *Williams*, 474 U. S., at 332, we reaffirmed the point that "[o]ur Constitution deals with the large concerns of the governors and the governed, but it does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society." We have accordingly rejected the lowest common denominator of customary tort lia-

---

erty interest of the sort claimed. For executive action challenges raise a particular need to preserve the constitutional proportions of constitutional claims, lest the Constitution be demoted to what we have called a font of tort law. Thus, in a due process challenge to executive action, the threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience. That judgment may be informed by a history of liberty protection, but it necessarily reflects an understanding of traditional executive behavior, of contemporary practice, and of the standards of blame generally applied to them. Only if the necessary condition of egregious behavior were satisfied would there be a possibility of recognizing a substantive due process right to be free of such executive action, and only then might there be a debate about the sufficiency of historical examples of enforcement of the right claimed, or its recognition in other ways. In none of our prior cases have we considered the necessity for such examples, and no such question is raised in this case.

In sum, the difference of opinion in *Glucksberg* was about the need for historical examples of recognition of the claimed liberty protection at some appropriate level of specificity. In an executive action case, no such issue can arise if the conduct does not reach the degree of the egregious.

bility as any mark of sufficiently shocking conduct, and have held that the Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process. See *id.*, at 328; see also *Davidson* v. *Cannon*, 474 U. S., at 348 (clarifying that *Daniels* applies to substantive, as well as procedural, due process). It is, on the contrary, behavior at the other end of the culpability spectrum that would most probably support a substantive due process claim; conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level. See *Daniels* v. *Williams*, 474 U. S., at 331 ("Historically, this guarantee of due process has been applied to *deliberate* decisions of government officials to deprive a person of life, liberty, or property" (emphasis in original)).

Whether the point of the conscience shocking is reached when injuries are produced with culpability falling within the middle range, following from something more than negligence but "less than intentional conduct, such as recklessness or 'gross negligence,'" *id.*, at 334, n. 3, is a matter for closer calls.[9] To be sure, we have expressly recognized the possibility that some official acts in this range may be actionable under the Fourteenth Amendment, *ibid.*, and our cases have compelled recognition that such conduct is egregious enough to state a substantive due process claim in at least one instance. We held in *City of Revere* v. *Massachusetts Gen. Hospital*, 463 U. S. 239 (1983), that "the due process rights of a [pretrial detainee] are at least as great as the

---

[9] In *Rochin* v. *California*, 342 U. S. 165 (1952), the case in which we formulated and first applied the shocks-the-conscience test, it was not the ultimate purpose of the government actors to harm the plaintiff, but they apparently acted with full appreciation of what the Court described as the brutality of their acts. *Rochin*, of course, was decided long before *Graham* v. *Connor* (and *Mapp* v. *Ohio*, 367 U. S. 643 (1961)), and today would be treated under the Fourth Amendment, albeit with the same result.

Eighth Amendment protections available to a convicted prisoner." *Id.*, at 244 (citing *Bell* v. *Wolfish*, 441 U. S. 520, 535, n. 16, 545 (1979)). Since it may suffice for Eighth Amendment liability that prison officials were deliberately indifferent to the medical needs of their prisoners, see *Estelle* v. *Gamble*, 429 U. S. 97, 104 (1976), it follows that such deliberately indifferent conduct must also be enough to satisfy the fault requirement for due process claims based on the medical needs of someone jailed while awaiting trial, see, *e. g.*, *Barrie* v. *Grand County, Utah*, 119 F. 3d 862, 867 (CA10 1997); *Weyant* v. *Okst*, 101 F. 3d 845, 856 (CA2 1996).[10]

Rules of due process are not, however, subject to mechanical application in unfamiliar territory. Deliberate indifference that shocks in one environment may not be so patently egregious in another, and our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking. What we have said of due process in the procedural sense is just as true here:

> "The phrase [due process of law] formulates a concept less rigid and more fluid than those envisaged in other specific and particular provisions of the Bill of Rights. Its application is less a matter of rule. Asserted denial is to be tested by an appraisal of the totality of facts in a given case. That which may, in one setting, constitute a denial of fundamental fairness, shocking to the universal sense of justice, may, in other circumstances, and in the light of other considerations, fall short of such denial." *Betts* v. *Brady*, 316 U. S. 455, 462 (1942).

---

[10] We have also employed deliberate indifference as a standard of culpability sufficient to identify a dereliction as reflective of municipal policy and to sustain a claim of municipal liability for failure to train an employee who causes harm by unconstitutional conduct for which he would be individually liable. See *Canton* v. *Harris*, 489 U. S. 378, 388–389 (1989).

Thus, attention to the markedly different circumstances of normal pretrial custody and high-speed law enforcement chases shows why the deliberate indifference that shocks in the one case is less egregious in the other (even assuming that it makes sense to speak of indifference as deliberate in the case of sudden pursuit). As the very term "deliberate indifference" implies, the standard is sensibly employed only when actual deliberation is practical, see *Whitley* v. *Albers,* 475 U. S., at 320,[11] and in the custodial situation of a prison, forethought about an inmate's welfare is not only feasible but obligatory under a regime that incapacitates a prisoner to exercise ordinary responsibility for his own welfare.

> "[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being. The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e. g.,* food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the . . . Due Process Clause." *DeShaney* v. *Winnebago County Dept. of Social Servs.,* 489 U. S., at 199–200 (citation and footnote omitted).

Nor does any substantial countervailing interest excuse the State from making provision for the decent care and protection of those it locks up; "the State's responsibility to attend

---

[11] By "actual deliberation," we do not mean "deliberation" in the narrow, technical sense in which it has sometimes been used in traditional homicide law. See, *e. g., Caldwell* v. *State,* 84 So. 272, 276 (Ala. 1919) (noting that "'deliberation here does not mean that the man slayer must ponder over the killing for a long time'"; rather, "it may exist and may be entertained while the man slayer is pressing the trigger of the pistol that fired the fatal shot[,] even if it be only for a moment or instant of time").

to the medical needs of prisoners [or detainees] does not ordinarily clash with other equally important governmental responsibilities." *Whitley* v. *Albers, supra,* at 320.[12]

But just as the description of the custodial prison situation shows how deliberate indifference can rise to a constitutionally shocking level, so too does it suggest why indifference may well not be enough for liability in the different circumstances of a case like this one. We have, indeed, found that deliberate indifference does not suffice for constitutional liability (albeit under the Eighth Amendment) even in prison circumstances when a prisoner's claim arises not from normal custody but from response to a violent disturbance. Our analysis is instructive here:

> "[I]n making and carrying out decisions involving the use of force to restore order in the face of a prison disturbance, prison officials undoubtedly must take into account the very real threats the unrest presents to inmates and prison officials alike, in addition to the possible harms to inmates against whom force might be used. . . . In this setting, a deliberate indifference standard does not adequately capture the importance of such competing obligations, or convey the appropriate hesitancy to critique in hindsight decisions necessarily made in haste, under pressure, and frequently without the luxury of a second chance." *Whitley* v. *Albers,* 475 U. S., at 320.

We accordingly held that a much higher standard of fault than deliberate indifference has to be shown for officer liabil-

---

[12] *Youngberg* v. *Romeo,* 457 U. S. 307 (1982), can be categorized on much the same terms. There, we held that a severely retarded person could state a claim under § 1983 for a violation of substantive due process if the personnel at the mental institution where he was confined failed to exercise professional judgment when denying him training and habilitation. *Id.,* at 319–325. The combination of a patient's involuntary commitment and his total dependence on his custodians obliges the government to take thought and make reasonable provision for the patient's welfare.

ity in a prison riot. In those circumstances, liability should turn on "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Id.*, at 320–321 (internal quotation marks omitted). The analogy to sudden police chases (under the Due Process Clause) would be hard to avoid.

Like prison officials facing a riot, the police on an occasion calling for fast action have obligations that tend to tug against each other. Their duty is to restore and maintain lawful order, while not exacerbating disorder more than necessary to do their jobs. They are supposed to act decisively and to show restraint at the same moment, and their decisions have to be made "in haste, under pressure, and frequently without the luxury of a second chance." *Id.*, at 320; cf. *Graham* v. *Connor*, 490 U. S., at 397 ("[P]olice officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving"). A police officer deciding whether to give chase must balance on one hand the need to stop a suspect and show that flight from the law is no way to freedom, and, on the other, the high-speed threat to all those within stopping range, be they suspects, their passengers, other drivers, or bystanders.

To recognize a substantive due process violation in these circumstances when only midlevel fault has been shown would be to forget that liability for deliberate indifference to inmate welfare rests upon the luxury enjoyed by prison officials of having time to make unhurried judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations. When such extended opportunities to do better are teamed with protracted failure even to care, indifference is truly shocking. But when unforeseen circumstances demand an officer's instant judgment, even precipitate recklessness fails to inch close enough to harmful purpose to spark the shock that implicates "the large concerns of the governors and the governed." *Daniels* v. *Wil-*

*liams,* 474 U. S., at 332. Just as a purpose to cause harm is needed for Eighth Amendment liability in a riot case, so it ought to be needed for due process liability in a pursuit case. Accordingly, we hold that high-speed chases with no intent to harm suspects physically or to worsen their legal plight do not give rise to liability under the Fourteenth Amendment, redressible by an action under § 1983.[13]

The fault claimed on Smith's part in this case accordingly fails to meet the shocks-the-conscience test. In the count charging him with liability under § 1983, respondents' complaint alleges a variety of culpable states of mind: "negligently responsible in some manner," App. 11, Count one, ¶ 8, "reckless and careless," *id.,* at 12, ¶ 15, "recklessness, gross negligence and conscious disregard for [Lewis's] safety," *id.,* at 13, ¶ 18, and "oppression, fraud and malice," *ibid.* The subsequent summary judgment proceedings revealed that the height of the fault actually claimed was "conscious disregard," the malice allegation having been made in aid of a request for punitive damages, but unsupported either in allegations of specific conduct or in any affidavit of fact offered on the motions for summary judgment. The Court of Appeals understood the claim to be one of deliberate indifference to Lewis's survival, which it treated as equivalent to one of reckless disregard for life. We agree with this reading of respondents' allegations, but consequently part company from the Court of Appeals, which found them sufficient to state a substantive due process claim, and from the District Court, which made the same assumption *arguendo.*[14]

---

[13] Cf. *Checki* v. *Webb,* 785 F. 2d 534, 538 (CA5 1986) ("Where a citizen suffers physical injury due to a police officer's *negligent use* of his vehicle, no section 1983 claim is stated. It is a different story when a citizen suffers or is seriously threatened with physical injury due to a police officer's *intentional misuse* of his vehicle" (citation omitted)).

[14] To say that due process is not offended by the police conduct described here is not, of course, to imply anything about its appropriate treatment under state law. See *Collins* v. *Harker Heights,* 503 U. S. 115, 128–129 (1992) (decisions about civil liability standards that "involve a host of pol-

Smith was faced with a course of lawless behavior for which the police were not to blame. They had done nothing to cause Willard's high-speed driving in the first place, nothing to excuse his flouting of the commonly understood law enforcement authority to control traffic, and nothing (beyond a refusal to call off the chase) to encourage him to race through traffic at breakneck speed forcing other drivers out of their travel lanes. Willard's outrageous behavior was practically instantaneous, and so was Smith's instinctive response. While prudence would have repressed the reaction, the officer's instinct was to do his job as a law enforcement officer, not to induce Willard's lawlessness, or to terrorize, cause harm, or kill. Prudence, that is, was subject to countervailing enforcement considerations, and while Smith exaggerated their demands, there is no reason to believe that they were tainted by an improper or malicious motive on his part.

Regardless whether Smith's behavior offended the reasonableness held up by tort law or the balance struck in law enforcement's own codes of sound practice, it does not shock the conscience, and petitioners are not called upon to answer for it under § 1983. The judgment below is accordingly reversed.

*It is so ordered.*

CHIEF JUSTICE REHNQUIST, concurring.

I join the opinion of the Court in this case. The first question presented in the county's petition for certiorari is:

"Whether, in a police pursuit case, the legal standard of conduct necessary to establish a violation of substan-

---

icy choices . . . must be made by locally elected representatives [or by courts enforcing the common law of torts], rather than by federal judges interpreting the basic charter of Government for the entire country"). Cf. *Thomas* v. *City of Richmond,* 9 Cal. 4th 1154, 892 P. 2d 1185 (1995) (en banc) (discussing municipal liability under California law for injuries caused by police pursuits).

tive due process under the Fourteenth Amendment is 'shocks the conscience'. . . or is 'deliberate indifference' or 'reckless disregard.'" Pet. for Cert. i.

The county's petition assumed that the constitutional question was one of substantive due process, and the parties briefed the question on that assumption. The assumption was surely not without foundation in our case law, as the Court makes clear. *Ante*, at 846–847. The Court is correct in concluding that "shocks the conscience" is the right choice among the alternatives posed in the question presented, and correct in concluding that this demanding standard has not been met here.

JUSTICE KENNEDY, with whom JUSTICE O'CONNOR joins, concurring.

I join the opinion of the Court, and write this explanation of the objective character of our substantive due process analysis.

The Court is correct, of course, in repeating that the prohibition against deprivations of life, liberty, or property contained in the Due Process Clause of the Fourteenth Amendment extends beyond the command of fair procedures. It can no longer be controverted that due process has a substantive component as well. See, *e. g., Washington* v. *Glucksberg,* 521 U. S. 702 (1997); *Planned Parenthood of Southeastern Pa.* v. *Casey,* 505 U. S. 833 (1992); *Collins* v. *Harker Heights,* 503 U. S. 115, 125–128 (1992); *Michael H.* v. *Gerald D.,* 491 U. S. 110 (1989). As a consequence, certain actions are prohibited no matter what procedures attend them. In the case before us, there can be no question that an interest protected by the text of the Constitution is implicated: The actions of the State were part of a causal chain resulting in the undoubted loss of life. We have no definitional problem, then, in determining whether there is an interest sufficient to invoke due process. Cf. *Ohio Adult Parole Authority* v. *Woodard, ante,* p. 272.

What we do confront is the question of the standard of conduct the Constitution requires the State, in this case the local police, to follow to protect against the unintentional taking of life in the circumstances of a police pursuit. Unlike the separate question whether or not, given the fact of a constitutional violation, the state entity is liable for damages, see *Monell* v. *New York City Dept. of Social Servs.*, 436 U. S. 658, 694–695 (1978); *Canton* v. *Harris*, 489 U. S. 378 (1989), which is a matter of statutory interpretation or elaboration, the question here is the distinct, anterior issue whether or not a constitutional violation occurred at all. See *Collins* v. *Harker Heights, supra*, at 120, 124.

The Court decides this case by applying the "shocks the conscience" test first recognized in *Rochin* v. *California*, 342 U. S. 165, 172–173 (1952), and reiterated in subsequent decisions. The phrase has the unfortunate connotation of a standard laden with subjective assessments. In that respect, it must be viewed with considerable skepticism. As our opinion in *Collins* v. *Harker Heights* illustrates, however, the test can be used to mark the beginning point in asking whether or not the objective character of certain conduct is consistent with our traditions, precedents, and historical understanding of the Constitution and its meaning. 503 U. S., at 126–128. As JUSTICE SCALIA is correct to point out, we so interpreted the test in *Glucksberg*. *Post*, at 860–861 (opinion concurring in judgment). In the instant case, the authorities cited by JUSTICE SCALIA are persuasive, indicating that we would contradict our traditions were we to sustain the claims of the respondents.

That said, it must be added that history and tradition are the starting point but not in all cases the ending point of the substantive due process inquiry. There is room as well for an objective assessment of the necessities of law enforcement, in which the police must be given substantial latitude and discretion, acknowledging, of course, the primacy of the interest in life which the State, by the Fourteenth Amend-

ment, is bound to respect.   I agree with the Court's assessment of the State's interests in this regard.   Absent intent to injure, the police, in circumstances such as these, may conduct a dangerous chase of a suspect who disobeys a lawful command to stop when they determine it is appropriate to do so.   There is a real danger in announcing a rule, or suggesting a principle, that in some cases a suspect is free to ignore a lawful police command to stop.   No matter how narrow its formulation, any suggestion that suspects may ignore a lawful command to stop and then sue for damages sustained in an ensuing chase might cause suspects to flee more often, increasing accidents of the kind which occurred here.

Though I share JUSTICE SCALIA's concerns about using the phrase "shocks the conscience" in a manner suggesting that it is a self-defining test, the reasons the Court gives in support of its judgment go far toward establishing that objective considerations, including history and precedent, are the controlling principle, regardless of whether the State's action is legislative or executive in character.   To decide this case, we need not attempt a comprehensive definition of the level of causal participation which renders a State or its officers liable for violating the substantive commands of the Fourteenth Amendment.   It suffices to conclude that neither our legal traditions nor the present needs of law enforcement justify finding a due process violation when unintended injuries occur after the police pursue a suspect who disobeys their lawful order to stop.

JUSTICE BREYER, concurring.

I join the Court's judgment and opinion.   I write separately only to point out my agreement with JUSTICE STEVENS, *post*, at 859, that *Siegert* v. *Gilley*, 500 U. S. 226 (1991), should not be read to deny lower courts the flexibility, in appropriate cases, to decide 42 U. S. C. § 1983 claims on the basis of qualified immunity, and thereby avoid wrestling with

constitutional issues that are either difficult or poorly presented. See *Siegert, supra*, at 235 (KENNEDY, J., concurring) (lower court "adopted the altogether normal procedure of deciding the case before it on the ground that appeared to offer the most direct and appropriate resolution, and one argued by the parties").

JUSTICE STEVENS, concurring in the judgment.

When defendants in a 42 U. S. C. § 1983 action argue in the alternative (a) that they did not violate the Constitution, and (b) that in any event they are entitled to qualified immunity because the constitutional right was not clearly established, the opinion in *Siegert* v. *Gilley*, 500 U. S. 226 (1991), tells us that we should address the constitutional question at the outset. That is sound advice when the answer to the constitutional question is clear. When, however, the question is both difficult and unresolved, I believe it wiser to adhere to the policy of avoiding the unnecessary adjudication of constitutional questions. Because I consider this such a case, I would reinstate the judgment of the District Court on the ground that the relevant law was not clearly defined in 1990.

The Court expresses concern that deciding the immunity issue without resolving the underlying constitutional question would perpetuate a state of uncertainty in the law. *Ante*, at 841–842, n. 5. Yet the Court acknowledges, as it must, that a qualified immunity defense is unavailable in an action against the municipality itself. *Ibid.* Sound reasons exist for encouraging the development of new constitutional doctrines in adversarial suits against municipalities, which have a substantial stake in the outcome and a risk of exposure to damages liability even when individual officers are plainly protected by qualified immunity.

In sum, I would hold that Officer Smith is entitled to qualified immunity. Accordingly, I concur in the Court's judgment, but I do not join its opinion.

JUSTICE SCALIA, with whom JUSTICE THOMAS joins, concurring in the judgment.

Today's opinion gives the lie to those cynics who claim that changes in this Court's jurisprudence are attributable to changes in the Court's membership. It proves that the changes are attributable to nothing but the passage of time (not much time, at that), plus application of the ancient maxim, "That was then, this is now."

Just last Term, in *Washington* v. *Glucksberg,* 521 U. S. 702, 720–722 (1997), the Court specifically rejected the method of substantive-due-process analysis employed by JUSTICE SOUTER in his concurrence in that case, which is the very same method employed by JUSTICE SOUTER in his opinion for the Court today. To quote the opinion in *Glucksberg:*

> "Our established method of substantive-due-process analysis has two primary features: First, we have regularly observed that the Due Process Clause specially protects those fundamental rights and liberties which are, objectively, 'deeply rooted in this Nation's history and tradition,' . . . and 'implicit in the concept of ordered liberty' . . . . Second, we have required in substantive-due-process cases a 'careful description' of the asserted fundamental liberty interest. . . . Our Nation's history, legal traditions, and practices thus provide the crucial 'guideposts for responsible decisionmaking,' . . . that direct and restrain our exposition of the Due Process Clause. . . .
>
> "JUSTICE SOUTER . . . would largely abandon this restrained methodology, and instead ask 'whether [Washington's] statute sets up one of those "arbitrary impositions" or "purposeless restraints" at odds with the Due Process Clause . . .' [citations and footnote omitted]. In our view, however, the development of this Court's substantive-due-process jurisprudence . . . has been a process whereby the outlines of the 'liberty' specially protected by the Fourteenth Amendment . . . have at

least been carefully refined by concrete examples involving fundamental rights found to be deeply rooted in our legal tradition. This approach tends to rein in the subjective elements that are necessarily present in due process judicial review." *Id.*, at 720–722.

Today, so to speak, the stone that the builders had rejected has become the foundation stone of our substantive-due-process jurisprudence. The atavistic methodology that JUSTICE SOUTER announces for the Court is the very same methodology that the Court called atavistic when it was proffered by JUSTICE SOUTER in *Glucksberg*. In fact, if anything, today's opinion is even more of a throwback to highly subjective substantive-due-process methodologies than the concurrence in *Glucksberg* was. Whereas the latter said merely that substantive due process prevents "arbitrary impositions" and "purposeless restraints" (without any objective criterion as to what is arbitrary or purposeless), today's opinion resuscitates the *ne plus ultra*, the Napoleon Brandy, the Mahatma Gandhi, the Cellophane[1] of subjectivity, th' ol' "shocks-the-conscience" test. According to today's opinion, this is the *measure* of arbitrariness when what is at issue is executive, rather than legislative, action. *Ante*, at 846–847.[2]

---

[1] For those unfamiliar with classical music, I note that the exemplars of excellence in the text are borrowed from Cole Porter's "You're the Top," copyright 1934.

[2] The proposition that "shocks-the-conscience" is a test applicable only to executive action is original with today's opinion. That has never been suggested in any of our cases, and in fact "shocks-the-conscience" was recited in at least one opinion involving legislative action. See *United States* v. *Salerno*, 481 U. S. 739, 746 (1987) (in considering whether the Bail Reform Act of 1984 violated the Due Process Clause, we said that "[s]o-called 'substantive due process' prevents the government from engaging in conduct that 'shocks the conscience'"). I am of course happy to accept whatever limitations the Court today is willing to impose upon the "shocks-the-conscience" test, though it is a puzzlement why substantive due process protects some liberties against executive officers but not against legislatures.

*Glucksberg*, of course, rejected "shocks-the-conscience," just as it rejected the less subjective "arbitrary action" test. A 1992 executive-action case, *Collins* v. *Harker Heights*, 503 U. S. 115, which had paid lipservice to "shocks-the-conscience," see *id.*, at 128, was cited in *Glucksberg* for the proposition that "[o]ur Nation's history, legal traditions, and practices . . . provide the crucial 'guideposts for responsible decisionmaking.'" 521 U. S., at 721, quoting *Collins, supra,* at 125. In fact, even before *Glucksberg* we had characterized the last "shocks-the-conscience" claim to come before us as "nothing more than [a] bald assertio[n]," and had rejected it on the objective ground that the petitioner "failed to proffer any historical, textual, or controlling precedential support for [his alleged due process right], and we decline to fashion a new due process right out of thin air." *Carlisle* v. *United States*, 517 U. S. 416, 429 (1996).

Adhering to our decision in *Glucksberg*, rather than ask whether the police conduct here at issue shocks my unelected conscience, I would ask whether our Nation has traditionally protected the right respondents assert. The first step of our analysis, of course, must be a "careful description" of the right asserted, *Glucksberg, supra,* at 721. Here the complaint alleges that the police officer deprived Lewis "of his Fourteenth Amendment right to life, liberty and property without due process of law when he operated his vehicle with recklessness, gross negligence and conscious disregard for his safety." App. 13. I agree with the Court's conclusion that this asserts a substantive right to be free from "deliberate or reckless indifference to life in a high-speed automobile chase aimed at apprehending a suspected offender." *Ante,* at 836; see also *ante,* at 853.

Respondents provide no textual or historical support for this alleged due process right, and, as in *Carlisle*, I would "decline to fashion a new due process right out of thin air." 517 U. S., at 429. Nor have respondents identified any precedential support. Indeed, precedent is to the contrary:

"Historically, th[e] guarantee of due process has been applied to *deliberate* decisions of government officials to deprive a person of life, liberty, or property." *Daniels* v. *Williams*, 474 U. S. 327, 331 (1986) (citations omitted); *Collins, supra,* at 127, n. 10 (same). Though it is true, as the Court explains, that "deliberate indifference" to the medical needs of pretrial detainees, *City of Revere* v. *Massachusetts Gen. Hospital,* 463 U. S. 239, 244–245 (1983), or of involuntarily committed mental patients, *Youngberg* v. *Romeo,* 457 U. S. 307, 314–325 (1982), may violate substantive due process, it is not the deliberate indifference alone that is the "deprivation." Rather, it is that combined with "the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty," *DeShaney* v. *Winnebago County Dept. of Social Servs.,* 489 U. S. 189, 200 (1989). "[W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and *at the same time* fails to provide for his basic human needs[,] . . . it transgresses the substantive limits on state action set by the . . . Due Process Clause." *Ibid.* (emphasis added). We have expressly left open whether, in a context in which the individual has *not* been deprived of the ability to care for himself in the relevant respect, "something less than intentional conduct, such as recklessness or 'gross negligence,'" can ever constitute a "deprivation" under the Due Process Clause. *Daniels,* 474 U. S., at 334, n. 3. Needless to say, if it is an open question whether recklessness can *ever* trigger due process protections, there is no precedential support for a substantive-due-process right to be free from reckless police conduct during a car chase.

To hold, as respondents urge, that all government conduct deliberately indifferent to life, liberty, or property violates the Due Process Clause would make " 'the Fourteenth Amendment a font of tort law to be superimposed upon whatever

systems may already be administered by the States.'" *Id.*, at 332, quoting *Paul* v. *Davis,* 424 U. S. 693, 701 (1976) (other citation omitted). Here, for instance, it is not fair to say that it was the police officer alone who "deprived" Lewis of his life. Though the police car did run Lewis over, it was the driver of the motorcycle, Willard, who dumped Lewis in the car's path by recklessly making a sharp left turn at high speed. (Willard had the option of rolling to a gentle stop and showing the officer his license and registration.) Surely Willard "deprived" Lewis of his life in every sense that the police officer did. And if Lewis encouraged Willard to make the reckless turn, Lewis himself would be responsible, at least in part, for his own death. Was there contributory fault on the part of Willard or Lewis? Did the police officer have the "last clear chance" to avoid the accident? Did Willard and Lewis, by fleeing from the police, "assume the risk" of the accident? These are interesting questions of tort law, not of constitutional governance. "Our Constitution deals with the large concerns of the governors and the governed, but it does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society." *Daniels, supra,* at 332. As we have said many times, "the Due Process Clause of the Fourteenth Amendment . . . does not transform every tort committed by a state actor into a constitutional violation." *DeShaney, supra,* at 202 (citations omitted).

If the people of the State of California would prefer a system that renders police officers liable for reckless driving during high-speed pursuits, "[t]hey may create such a system . . . by changing the tort law of the State in accordance with the regular lawmaking process." 489 U. S., at 203. For now, they prefer not to hold public employees "liable for civil damages on account of personal injury to or death of any person or damage to property resulting from the operation, in the line of duty, of an authorized emergency vehicle . . . when in the immediate pursuit of an actual or suspected vio-

lator of the law." Cal. Veh. Code Ann. § 17004 (West 1971). It is the prerogative of a self-governing people to make that legislative choice. "Political society," as the Seventh Circuit has observed, "must consider not only the risks to passengers, pedestrians, and other drivers that high-speed chases engender, but also the fact that if police are forbidden to pursue, then many more suspects will flee—and successful flights not only reduce the number of crimes solved but also create their own risks for passengers and bystanders." *Mays* v. *City of East St. Louis*, 123 F. 3d 999, 1003 (1997). In allocating such risks, the people of California and their elected representatives may vote their consciences. But for judges to overrule that democratically adopted policy judgment on the ground that it shocks *their* consciences is not judicial review but judicial governance.

I would reverse the judgment of the Ninth Circuit, not on the ground that petitioners have failed to shock my still, soft voice within, but on the ground that respondents offer no textual or historical support for their alleged due process right. Accordingly, I concur in the judgment of the Court.