

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-8-2007

# Cherry v. Philadelphia

Precedential or Non-Precedential: Non-Precedential

Docket No. 06-1322

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"Cherry v. Philadelphia" (2007). *2007 Decisions.* Paper 1645.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/1645

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

―――

No. 06-1322

―――

MONICA LATOYA CHERRY,
Appellant

v.

CITY OF PHILADELPHIA; POLICE COMMISSIONER;
OFFICE OF DISTRICT ATTORNEY OF PHILADELPHIA

―――

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 04-cv-01393)
District Judge: Hon. Thomas N. O'Neill

―――

Submitted Under Third Circuit LAR 34.1(a)
January 19, 2007

Before: SLOVITER, RENDELL, and CUDAHY,* Circuit Judges

(Filed February 8, 2007)

OPINION

―――

_____

    * Hon. Richard D. Cudahy, United States Senior Circuit
Judge for the United States Court of Appeals for the Seventh
Circuit, sitting by designation.

CUDAHY, <u>Circuit Judge</u>.

Monica Cherry appeals the district court's grant of summary judgment to Philadelphia Police Commissioner Sylvester Johnson on her claim that Johnson led a plot to put Cherry at risk of murder in order to further a police investigation. Because Cherry has not presented sufficient evidence to raise a genuine issue of material fact on her claims, we affirm.

Because we write primarily for the parties, who are already aware of the circumstances of the case, we will set forth only those facts necessary to our decision. Cherry alleges a complicated course of police misconduct. On February 25, 2002, Cherry witnessed a gunfight between rival drug gangs at a "speakeasy," a private house that doubled as a bar. Two days later Philadelphia police officers seized her from her home and interrogated her about the shootings, but she told them she had quickly fled the scene once the shooting started (App. at 54), and refused to testify.

Then, Cherry alleges, the police borrowed a tactic used by Detective Sonny Crockett in the pilot episode of *Miami Vice*: although Cherry was not cooperating, the police, at the direction of (then Acting) Police Commissioner Sylvester Johnson, the only remaining defendant in the case (*see* App. at 20, 34), gave Philadelphia's criminal underworld the impression that she was. The idea, Cherry asserts, was that by identifying Cherry as a cooperating witness, the police would increase the risk that the speakeasy shooters would murder Cherry to keep her from testifying, which risk in turn would ideally force Cherry to *actually* cooperate with the police in exchange for protection from

the gang. As it turned out, the result was not ideal; Cherry was shot in the back of the head by an unidentified person while walking near her house with a friend on March 30, 2002. Cherry survived, but suffered severe brain damage.

On appeal, Cherry focuses on her claim that Johnson violated the Due Process Clause of the Fourteenth Amendment by deliberately putting her at risk of murder. (Though her brief sometimes obscurely gestures toward other claims or theories, we agree with the defendants that all other issues have not been adequately argued and are forfeited. *See, e.g., Travitz v. Northeast Dep't ILGWU Health & Welfare Fund*, 13 F.3d 704, 711 (3d Cir. 1994).) She invokes the "state-created danger" doctrine, under which government actors violate the Due Process Clause when, acting in an egregious manner that shocks the conscience, they create an opportunity for harm to befall a plaintiff with which they have some sort of relationship and foreseeable, direct harm does occur. *Schieber v. City of Philadelphia*, 320 F.3d 409, 416-17 (3d Cir. 2003), *citing Kniepp v. Tedder*, 95 F.3d 1199, 1208 (3d Cir. 1996). Since Cherry is suing the supervisory official Johnson rather than whichever police officers allegedly put the plot into action, and since *respondeat superior* does not apply to § 1983 claims, she must additionally also show evidence tying Johnson to the plot. To hold Johnson liable in his personal capacity, Cherry must show that the police acted at Johnson's personal direction or that Johnson had knowledge of and acquiesced in the plot. *Andrews v. City of Philadelphia*, 895 F.2d 1469,1478 (3d Cir. 1990). To hold Johnson liable in his official capacity (i.e., to hold the City of Philadelphia liable), Cherry must show that the police acted pursuant to a city

3

policy or custom. *Monell v. Department of Soc. Servs. of City of New York*, 436 U.S. 658, 690-91 (1978).

The district court held that Johnson would be liable if he had in fact directed the police to identify Cherry as a cooperating witness and in so doing caused her shooting, but that Cherry had failed to present evidence that he had done so. We agree with the district court. As Cherry's counsel frequently points out, summary judgment is appropriate only where the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Once the movant explains to the court why it believes there is no genuine issue of material fact, the nonmovant must demonstrate evidence in the record that would permit a reasonable factfinder to find in her favor. *Celotex Corp. v. Catrett*, 477 U.S. 317, 332-34 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-52 (1986); *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006).

In the present case, Johnson notes a famine of evidence tying him to the alleged plot, establishing that the plot existed or even showing that the police failed to protect Cherry from the speakeasy shooters. Johnson observes, and Cherry does not dispute, that the record lacks affidavits on these subjects even from Cherry herself. The only record evidence to which Cherry draws our attention is a pair of Philadelphia Inquirer articles from April 5 and April 6, 2002, about a week after Cherry was shot, one of which quotes Johnson as saying that "[o]ne of those witnesses [who was cooperating] was shot Saturday, shot in the head." (App. at 84-86.) The article shows that Johnson stated that

4

Cherry was a cooperating witness after she suffered her injuries, but the statement obviously could not have caused her already-suffered injuries and indeed only identified Cherry to those who already knew she had been shot. Cherry argues that the article demonstrates that Johnson had motive and opportunity to authorize the alleged plot against her (Br. of Appellant at 7), and that her injuries were a foreseeable outcome of the plot (Reply Br. of Appellant at 4). But that is not enough to get her to trial without some evidence that the alleged plot actually existed; it is as though one were to seek a murder trial armed with evidence of the defendant's motive and opportunity to commit a hypothetical murder, but without a body or any evidence that a murder had taken place. The article is by itself insufficient to permit a reasonable factfinder to infer both that there was a plot to put Cherry in danger before her shooting and that Johnson was aware of or in charge of it.

Even assuming there was evidence in the record to back up Cherry's other specific allegations, she still might not make it to trial on her state-created danger claim. Cherry claims that Johnson had the police frequently call and visit her and cites to a pair of newspaper articles, neither apparently in the record. A March 16, 2002 Philadelphia Daily News article quoted a police officer (not Johnson) as stating that police had "talked with witnesses" but that they were "reluctant to talk," and police were offering a $5,000 reward to loosen tongues. Erin Einhorn, *City posts 5G reward in speakeasy killings*, Phila. Daily News, March 16, 2002. In a March 19, 2002 Philadelphia Inquirer article, another police officer (again not Johnson) was quoted as saying the reward "helped point

5

police to" two suspects. Thomas J. Gibbons, *Two sought in speakeasy shootings*, Phila. Inquirer, March 19, 2002. Without further explanation it is unclear why the speakeasy shooters would assume from such vague information that Cherry was the one who had given them up. Were the police also visiting other potential witnesses ("neighborhood residents," plural)? If so, why would the criminals focus on Cherry? (Cherry claims, again without evidence, that she was the only witness to testify at the eventual criminal trial, but the police might have checked other leads beforehand; Cherry admits that she herself identified other potential witnesses to the police. (Br. of Appellant at 8, App. at 53).) Why would the criminals believe Cherry was willing to testify merely from the fact that police were frequently visiting her house? Wouldn't that indicate, instead, that Cherry *wasn't* willing to testify and that the police were frequently coming to argue with her and change her mind?

True, the shooters might have targeted Cherry (and probably did) out of fear that she *might* cooperate, but Cherry does not allege that the speakeasy shooters were unaware that she was a potential witness before the police acted, only that the police suggested she was a *cooperating* witness who was willing to testify. Indeed, Cherry appears to say that everyone in her neighborhood already knew that she was a witness before the police said anything. (Br. of Appellant at 9.) Even assuming that the shooters only learned that Cherry was a potential witness from the police visits, it is doubtful whether any reasonable factfinder could find the police decision to speak to potential witnesses to a shootout, rather than simply let the crime go uninvestigated, was so egregious as to shock

6

the conscience. *Cf. County of Sacramento v. Lewis*, 523 U.S. 833, 853 (1998) (describing the conflicting obligations of police officers in a high-speed chase to enforce the law and to protect the public from the chase).

At any rate, all that is irrelevant speculation; Cherry has not produced sufficient evidence to permit a reasonable factfinder to conclude that those events occurred or that, if they did, Johnson was involved. Cherry attempts to excuse her failure of proof by challenging, for the first time in her reply brief, the district court's denial of a pair of motions to compel Johnson to answer to certain discovery requests. (Reply Br. of Appellant at 6-8.) However, arguments raised for the first time in a reply brief are forfeited. *United States v. Pelullo,* 399 F.3d 197, 222 (3d Cir. 2005), *cert denied*, 74 U.S.L.W. 3121 (U.S. Jan. 17, 2006) (No. 05-244). Even if she had made the argument earlier, the argument is forfeited by being insufficiently developed–it is entirely unclear from Cherry's brief what sort of evidence she hoped to discover, or why the district court might have abused its discretion in denying her motions to compel. If Cherry wished to appeal on the basis of discovery errors, she should have adequately explained those errors to the court in her opening brief.

There was no genuine issue of material fact on the record below, and Johnson was entitled to judgment as a matter of law. We therefore affirm summary judgment.