SLEET, District Judge,
Dissenting.
This case is on review at the summary judgment stage of these proceedings because the District Court rejected the appellants’ contention that the shield of qualified immunity protects them from liability for the appellees’ claimed injuries. In his opinion, Judge Stapleton states that, at this interlocutory stage of these proceedings, we must accept the “District Court’s determination that there is sufficient record evidence to support a set of facts under which there would be no immunity.” See Johnson v. Jones, 515 U.S. 304, 313, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995). Thus, he states that we “must accept the District Court’s finding of sufficient evidence to support a finding that a police instruction to do nothing but call 911 stopped the neighbors from effecting rescue themselves.” [1] (emphasis in the original). As such, it appears that Judge Sta-pleton reads Johnson to require that an appeals court limit its review of the pretrial record to those instances where the court is unable to determine from the trial court’s ruling the facts it relied upon when it denied summary judgment. In other words, he seems to read Johnson to direct the effort of the court of appeals to whether it can discern from the trial court’s ruling the facts it likely assumed, rather than whether that court’s factual assumptions are set forth explicitly in its opinion. In the case before us, Judge Stapleton believed that he was able to determine those facts from the body of the District Court’s opinion. Thus, he found no need to look beyond the four corners of that opinion.
In his concurrence, Judge Nygaard agrees that “we must accept the facts found by the District Court.” He seems also to agree with Judge Stapleton’s conclusion that the appellate court’s review of the pretrial record is limited to those instances noted above. Judge Nygaard does not appear to agree, however, that the District Court’s opinion in the matter before us adequately reveals the set of facts it assumed in rendering its immunity decision. Specifically, Judge Nygaard states that “[w]hen, as here, the ‘Facts’ found by the District Court are inconsistent with a *426 statement it makes in its ‘Discussion,’ I would base my analysis on the facts specifically found by the District Court.” Thus, it appears there is a difference in view as to what the Court meant in Johnson when discussing an appellate court’s determination of the set of facts the District Court assumed in ruling on a purely legal question presented by an assertion of qualified immunity. In other words, Judge Ny-gaard seems to differ with Judge Stapleton as to where we should look and how we should determine the facts assumed by the trial court in rendering its decision.
In his concurrence, Judge Nygaard states that “out of caution,” he reviewed the pretrial record before us. It would seem that the need for caution here was prompted by the District Court’s failure to set forth in explicit terms, either in the facts or background section of its opinion or in a manner clearly identifying it as such, the specific finding of fact that the officers gave the 911 instruction. Whether or not that was the catalyst, after his review of the record, Judge Nygaard found no support for the District Court’s finding of fact that the officers told the neighbors “to do nothing but call 911.” (emphasis in the original). Nevertheless, he agreed, albeit for different reasons, with Judge Stapleton’s conclusion.
I am unable to agree with my colleagues’ restrictive reading of Johnson. I too have reviewed the record, and in so doing, have concluded that there is a genuine issue as to whether the conduct of the officers violated clearly established law. I, therefore, respectfully dissent.
We exercise jurisdiction over this matter because, presumably, the question presented is purely legal, and not “whether or not [the] record demonstrates a ‘genuine issue of fact for trial’ ” Johnson, 515 U.S. at 316, 115 S.Ct. 2151. In Johnson, the Court wrestled with the challenge of separating reviewable immunity determinations of the District Court from those that are not. The Court discussed and analyzed the “competing considerations,” the wise use of appellate resources among them, involved in the question of limiting “ ‘qualified immunity’ matters to cases presenting more abstract issues of law.” Id. at 317, 115 S.Ct. 2151. Among other reasons to limit review of the pretrial record in immunity questions, the Court felt that it would be an unwise use of the resources of appellate courts to examine “questions about whether or not a record demonstrates” the presence of a triable issue because such questions “can consume inordinate amounts of appellate time.” Id. at 316, 115 S.Ct. 2151. Thus, the Court stated, “When faced with an argument that the District Court mistakenly identified clearly established law, the court of appeals can simply take, as given, the facts that the District Court assumed when it denied summary judgment for that (purely legal) reason.” Id. at 319, 115 S.Ct. 2151 (emphasis added).
Contrary to the view expressed by my colleagues, I believe the language used by the Court does not require acceptance of the facts assumed. It simply suggests that when the trial court sets forth its factual findings, courts of appeal need not “undertake a cumbersome review of the record to determine what facts the District Court ... likely assumed.” Id. at 319, 115 S.Ct. 2151. Conversely, the Court recognized that when the trial court fails to articulate the factual underpinning for its summary judgment ruling on a legal question, the court of appeals may have to engage in such a review. Clearly, in order to enable courts of appeal to operate more efficiently, and for the other reasons stated in its opinion in Johnson, the Court would prefer that trial courts say something in this regard. The Court did not say, how *427 ever, that it intended to restrict the ability of our circuit courts to review a record only to these instances. In other words, Johnson should not be read to stand for the proposition that, even though the District Court’s specific factual findings do not support its legal conclusions, when there is, in fact, support in the record for those conclusions, those facts should be ignored. If that is what Johnson means, circuit courts will be confined to the four corners of whatever the trial court says are the facts, and the legal conclusions based thereon — no matter how incorrect. This cannot be the result intended by the Court. Nor do I believe that my reading of Johnson offers what might be viewed as a loophole through which appellate courts can circumvent the limited constraints the Court has placed upon their ability to review immunity determinations by District Courts.
Keeping the applicable summary judgment principles as well as the teachings of Johnson v. Jones in mind, I believe that the only conclusion the present pretrial record supports is that there is a genuine issue for trial on the question of whether the conduct of the officers in this case shocks the conscience.
At his deposition Greeley testified as follows:
Q. And after Officer[s] Scherff and Woods left your building and while you were up watching The Terminator, you didn’t hear any sounds coming from Miss Schieber’s apartment, correct?
A. Correct.
Q. And the reason why you didn’t take any affirmative steps to take the door down was because you didn’t hear any sounds coming from Miss Schieber’s door, is that true — I’m sorry, Miss Schieber’s apartment?
A. Any further sounds after they had left?
Q. Yes.
A. Correct.
Q. So let me just ask it clearer, is the reason that you didn’t take down Miss Schieber’s door after the officers left while you were still awake was because you didn’t hear any sounds coming from Miss Schieber’s apartment?
A. Not entirely.
Q. Was it one of the reasons?
A. I mean it’s hard for me to predict what — if I hear anymore noise what I would have done. That’s sort of — but as far as I was concerned, once the police left, I was — it was in their hands to break down the door because that’s what they’re trained to do. I don’t look at it as my — I’m not trained to do so and I wasn’t.
Q. But had you heard some sounds, you would have taken some affirmative actions?
A. Probably, yes.
App. at 86.
Further, Greeley testified that, before the police arrived, he had considered knocking down the door. However, when asked what prevented him from doing so, he responded that “I’d be endangering Leah [Greeley’s companion] possibly, I’d be endangering myself.... I’m not trained to be breaking down people’s doors.... ” App. at 71. The record also reveals that, prior to the arrival of the officers, Greeley went downstairs to Reed’s apartment to seek assistance from an individual named Hooman. At the time, according to Greeley’s testimony, he was considering breaking down Ms. Schie-ber’s door. Unfortunately, Hooman was not there.
Given this record, the question of the impact of the 911 instruction on the neighbors, and whether it prevented Ms. Schie- *428 ber’s private rescue is one best left for a jury. That is, even if the specific instruction to do nothing but call 911 was not given by the officers, a jury should be permitted to determine whether “the record as a whole support[s] the finding that the message conveyed by the officers was to do nothing but call 911.”
These, however, are not the only material facts developed in the pretrial record that are relevant to the question of the propriety of the officers’ conduct, and whether that conduct is actionable. This presents two problems. First, Judge Sta-pleton’s analysis of the officers’ actions during their investigation does not go far enough. Put differently, and perhaps more accurately, the focus of the analysis is unduly narrow. Second, Judge Staple-ton finds that a trier of fact could not properly conclude that the officers were deliberately indifferent to Ms. Schieber’s constitutional rights because they “conducted an appropriate investigation.” I do not agree that the record evidence supports this conclusion. More fundamentally, I cannot agree that, given the record in this case, this is a conclusion that is within the competence of this court to make at this time. I will discuss each of these points in turn.
Judge Stapleton’s opinion focuses its attention almost exclusively on the District Court’s finding that the officers instructed Greeley and the other neighbors who were present that, should they hear anything else, they were to do nothing themselves, and instead, call 911 for police assistance. If that is all the officers did during their investigation, a stronger argument could certainly be made that, as a matter of law, this action does not demonstrate the type of deliberate indifference that, under the circumstances, shocks the conscience. It is not, however, all that was done.
Amy Reed was one of the neighbors at the scene when Woods and Scherff arrived. Reed provided the following testimony:
Q. Was there a conversation that you observed that took place between Mr. Greeley and the police after the police stopped knocking?
A. I did hear a conversation between them.
Q. Do you recall, sitting here today, what the conversation consisted of?
A. I remember as they were — or let me step back. I remember them — they had suggested some alternative possibilities for what he might have heard.
Q. Do you recall what alternative possibilities the police may have suggested?
A. They suggested that since it was 2 o’clock or thereabouts, that maybe people coming out of a bar, the noise had reached his apartment or perhaps he heard noises bouncing off of nearby buildings or walls in his apartment.
Q. Did Mr. Greeley respond in anyway?
A. Yes. He did not look favorably upon those explanations.
Q. But did he respond to them?
A. When they asked him, “Perhaps you heard people on the street”, (sic) he said something like, “No, I don’t think so, no.”
Q. In your presence, did he ever express uncertainty as to where he believed the noises were coming from inside the — noises were coming from?
A. He was quite certain what he had heard, who he had heard and where it had come from when he woke me up.
*429 He relayed that to the police.... [2]
App. at 31-82.
There is expert testimony in the record that establishes that when conducting an investigation of this type, police officers should ask open ended questions of witnesses rather than making suggestions of the type reflected in the exchange described by Reed. Judge Stapleton’s opinion does not seem to consider the effect of this conduct on this investigation, other than its impact on the behavior of the private citizens at the scene. In my view, this renders his analysis critically flawed.
I believe this to be so for the following reasons. The result of what the appellees characterize as the officers’ “cross-examination” of Greeley was that he appeared to be “uncertain” about the source of the noises he’d heard that morning. The appel-lees contend that the result of the use of this arguably improper investigative technique, along with the officers’ refusal to enter the apartment, was to “cause any private citizen to believe that he too was barred from making such entry.” Appel-lees Brief at 28-29. This argument sums up the difficulty I have with Judge Staple-ton’s analysis of the facts. If Greeley was in fact uncertain, this uncertainty may have resulted from improper questioning by the officers. Thus, while Judge Staple-ton focuses his attention upon the impact of the “911 instruction” on the neighbors, the record evidence, e.g., Reed’s testimony as well as expert opinion, establishes that there is a need for a broader inquiry.
This inquiry must be guided by more than just the court’s instincts or sense of what it believes should be the quantum of evidence necessary for a finding of liability in circumstances like those before the court. For guidance, Judge Stapleton looks to the Supreme Court’s decision in County of Sacramento v. Lewis, 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). He notes that Lewis teaches that there are two critical prerequisites to determining whether a tort of constitutional proportions has been committed: first, an understanding that “whether executive action is conscience shocking and thus ‘arbitrary in the constitutional sense’ depends on the context in which the action takes place,” and second, an exact analysis must be conducted of the circumstances confronting the decision maker. See Lewis, 523 U.S. at 848-50, 118 S.Ct. 1708. Judge Stapleton purports to adhere to this mandate, however, I do not believe the effort can withstand close scrutiny. Herein lies the source of my next, and last, disagreement with his view.
Judge Stapleton writes that “[c]ertainly this situation is much closer to that in Lewis [which involved a high speed vehicle pursuit] than to that of a prison physician deciding whether to treat a serious medical need.” In other words, he concludes that, although “an instantaneous judgment” was not required, there was insufficient time to engage in extended deliberation. Thus, Judge Stapleton suggests that “[i]t may well be that these circumstances, like those in Lewis, call for something more than a finding of ‘mid-level fault’ as a predicate for a conclusion that the officers’ conduct shocks the conscience.” It is somewhat unclear as to whether Judge Stapleton would, under circumstances such as these, require proof of intentional conduct. He reasons that he need not reach that issue. *430 Instead, he concludes that “the current record will not support a finding of deliberate indifference.”
Again looking to the Supreme Court for guidance, Judge Stapleton concludes that the Lewis and Farmer v. Brennan, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994), cases support the finding that deliberate indifference incorporates the concept of reckless behavior. More specifically, analogizing to the prison doctor situation, he concludes that, in order to find that Scherff and Woods were deliberately indifferent to Ms. Schieber’s plight, the record evidence would have to support the conclusion that they had “an actual, subjective appreciation of an excessive risk of serious harm to [Ms. Schieber] and that [they] ‘consciously disregarfed]’ that risk.” The underpinning for this conclusion is found in the following statement by Judge Stapleton:
Woods and Scherff were required to make a decision without delay and under the pressure that comes from knowing that the decision must be made on necessarily limited information. The required judgment involved the weighing of the important competing interests of personal security and privacy. This in turn required an evaluation of the dependability of Greeley’s report. The officers made the required judgment, and their discourse with the neighbors vouches that their focus was on the relevant considerations — the reliability of Greeley’s account and the impact of forced entry on [Ms. Schieber’s] privacy interests.
As Judge Stapleton writes, placement in the proper context is critical in determining “the degree of culpability required to meet the ‘shock the conscience’ standard.” At the outset, I question whether he has placed the facts and circumstances of this case in the proper context as is required by Lewis.
Judge Stapleton reasons that this case is “far from the situation of prison doctors.” First, I do not agree that the instant facts place this case either “much closer to that in Lewis” or “far from the situation of the prison doctors.” The facts and expertise upon which the court relies to reach this determination are unclear to me. Judge Stapleton writes that the officers “were required to make a decision without delay and under the pressure that comes from knowing that the decision must be made on necessarily limited information.” To the contrary, the record reveals that at least one hour elapsed from the first report to the police of noises from the Schie-ber apartment to when the officers arrived on the scene. Further, upon their arrival, they heard no further noises nor did they see any signs of forced entry. Of course, the argument could be made that, as a result of these facts, every second counted. But the facts tend to belie this conclusion. If the officers believed themselves under that kind of pressure, it seems that upon arrival at the scene, given Greeley’s initial report of cries for help, proper police procedure would have dictated that they break the door in immediately. Regardless, however, of whether this would have been the proper procedure, the officers took the time to survey the outside of the apartment for signs of forced entry. They also spoke with at least two witnesses regarding their observations — questioning one, Greeley, rather extensively. Thus, while I can agree that the circumstances do not place this case on the prison doctor side of the calculus for determining deliberate indifference, I cannot agree that the pressure was such that categorization of these circumstances as more equivalent to the hot pursuit scenario is appropriate either. Rather, I think, these facts place *431 this case somewhere in the middle, of the continuum of possibilities.
Moving to the second Lems requirement, Judge Stapleton’s “exact analysis” of the circumstances confronting the officers can be summed up in the conclusions noted above. The above-quoted passage from Judge Stapleton’s opinion is the essence of his finding that the conduct of the officers was not deliberately indifferent to Ms. Schieber’s needs at the time. In sum, Judge Stapleton made the following six conclusions: (1) the officers needed to make a decision without delay, (2) they were under pressure as a result of possessing only limited information, (3) the situation confronting them involved a judgment that required the weighing of important competing interests, (4) the judgment depended upon an evaluation of Greeley’s report, (5) the officers made the required judgment, and (6) their conversation with the neighbors, particularly Greeley, supports the conclusion that they focused on the relevant considerations. As just noted, each of these statements or findings is a conclusion. As with any conclusion, it is proper to determine whether there is a factual basis. Based on the pretrial record, I believe that only one of these conclusions is properly supported, and within the competence of this court to make at this time, namely, the legal conclusion that there were competing interests of personal security and privacy.
Rule 702 of the Federal Rules of Evidence recognizes that there are occasions when a fact finder needs the assistance of one with specialized knowledge in order to discharge its responsibilities. I will not repeat my discussion of Judge Stapleton’s application of the holding in Johnson v. Jones here. I think it is enough to point out that, before this court can judge the conduct of these officers, there must be greater development of the record so that the court can arrive at informed conclusions based upon adequately adduced facts and not its own well-intended but unguided supposition.

. Judge Stapleton notes that “the District Court found that the record as a whole supported the finding that the message conveyed by the officers was to do nothing but call 911.”

. Judge Stapleton writes that when the officers arrived and Greeley reported the source of the scream, "he exhibited uncertainty about its source.” Reed's testimony alone would seem to put this fact squarely at issue. Thus, I believe the District Court’s conclusion that Greeley was uncertain places Judge Sta-pleton in the untenable position of weighing this evidence. This is a job for a jury, not an appellate court.