# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

**October 1, 2007**

Charles R. Fulbruge III
Clerk

No. 06-31004

TINA ETEIR O'NEAL, Individually and on behalf of the Estate of Tres' O'Neal; CHAD O'NEAL, Individually and on behalf of the Estate of Tres' O'Neal,

　　　　　　　　　　　　　　　　Plaintiffs - Appellants,

v.

MICHAEL CAZES, as Sheriff of West Baton Rouge Parish; CHRISTOPHER BOUQUET; CHAD JESTER,

　　　　　　　　　　　　　　　　Defendants - Appellees.

Appeal from the United States District Court
for the Middle District of Louisiana, Baton Rouge
3:04-CV-207

Before KING, GARZA, and BENAVIDES, Circuit Judges.

PER CURIAM:[*]

Tina and Chad O'Neal ("the O'Neals" or "Appellants"), plaintiffs individually and on behalf of the Estate of Tres O'Neal, appeal from the district court's grant of summary judgment in favor of West Baton Rouge Parish Sheriff Michael Cazes ("Cazes") and Deputies Christopher Bouquet ("Bouquet") and Chad Jester ("Jester") on the O'Neals' claims under 42 U.S.C. § 1983 and

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

Louisiana state law for the alleged wrongful death of their sixteen year-old son, Tres O'Neal ("Tres").  For the following reasons, we affirm.

I.  BACKGROUND

The events that led to the death of Tres O'Neal began at approximately 10:30 p.m. on April 7, 2003.  At that time, Deputy Christopher Bouquet was on routine patrol when he stopped Tres O'Neal and Rochelle Adams ("Rochelle"), who were walking along Section Road in the rain.  When Bouquet recognized that the girl was the step-daughter of Deputy Chad Jester, he called Jester, who requested that he return Rochelle to the home of her father, Rodney Adams.  Bouquet instructed Tres to go to his grandparents' house (which is where Tres and Rochelle were walking to) and then drove Rochelle to the home of Rodney Adams, where they arrived at approximately 10:44 p.m.  After dropping off Rochelle, Bouquet resumed his patrol.

At some point thereafter, Rodney Adams noticed a new model sedan car, white or silver in color, driving up and down his street, Elm Grove Road.  The car came up and down the street four or five times and would stop about 100 yards away from the Adams' home.  Rodney Adams stated that it looked like the car was waiting for Rochelle.  He wanted to report the suspicious vehicle to the police and called Shannon Adams–his ex-wife, Rochelle's mother, and wife of Deputy Jester–who in turn called Deputy Jester.  Jester then called Bouquet on his cellular phone and told him that there was a suspicious silver Ford Taurus driving up and down Elm Grove Road.[1]  Jester asked Bouquet to increase the frequency of his patrols down the street to see if he could spot the suspicious vehicle.

---

[1] Jester further stated that the vehicle would pull up in front of the Adams' residence and turn off its lights, and when Rodney Adams would turn on his porch lights or the headlights of his car, the vehicle would leave and then return later.

On one such patrol, as Bouquet was traveling down Elm Grove Road, he encountered a "mystery vehicle" coming from the opposite direction. After passing the vehicle, Bouquet decided to turn around and check to see whether the vehicle matched the description of the suspicious vehicle reported by Rodney Adams. After turning around, he saw the mystery vehicle at the intersection of Elm Grove Road and Section Road. The mystery vehicle stopped at the stop sign at the intersection and, with its right blinker on, turned left on Section Road.

What happened next is hotly disputed. According to Bouquet, he attempted to catch up to the mystery vehicle in order to identify it. When Bouquet arrived at the intersection of Elm Grove Road and Section Road, all he could see were the brake lights of the mystery vehicle off in the distance. Bouquet turned onto Section Road and tried to catch up to the vehicle but was unable to do so despite traveling at speeds of up to ninety (90) miles per hour. Bouquet did not activate his siren or overhead lights, except briefly through an intersection. He did not notify the dispatcher or his supervisor that he was following a vehicle at high speeds, nor did he request any assistance.

Eventually, Bouquet saw the vehicle turn left onto River Road. At this point, he stopped pursuing the vehicle because he did not think he could catch up to it. Instead, he turned around and decided to attempt to intercept the vehicle at another location on River Road. Bouquet waited for the vehicle at the intercept point for approximately five to ten minutes but never encountered the vehicle. He then turned south onto River Road to try and locate the vehicle but could not find it. According to Bouquet, he suspected that the driver of the car was Tres O'Neal, but he never got close enough to the vehicle to identify it or its driver.

At approximately 4:44 a.m., Bouquet was dispatched to the Patin residence–the home of Tres O'Neal's grandparents. The Patins had reported that Tres and their blue Mercury Sable were missing. Deputy Bouquet was later

joined by Deputy Jester and Deputy Freddie Christopher. Shortly thereafter, there was a radio call about a car accident on Smithfield Road, and the three deputies responded to the call and went to the accident scene. Upon arrival, they learned that the driver of the vehicle was Tres O'Neal in the Patin's missing blue Mercury Sable. The car had collided with a utility pole, and Tres had been partially ejected from the vehicle. He was pronounced dead upon the scene. There were no witnesses to the accident. Deputy Kenneth Alvarez, the officer who investigated the accident and prepared the accident report, concluded that the accident occurred at approximately 1:58 a.m. (the time a nearby neighbor reported a power outage) and estimated that Tres had been driving in excess of 100 miles per hour at the time of the collision.

Appellants argue that Bouquet's version of the vehicle pursuit is untrue. Appellants contend that Bouquet knew or should have known Tres was driving the mystery vehicle, Bouquet initiated the pursuit, Tres fled because he did not know he was being pursued by the police, and Bouquet did not terminate the pursuit but rather continued the pursuit until Tres crashed the vehicle.

The O'Neals brought this suit individually and on behalf of Tres O'Neal's estate against West Baton Rouge Parish Sheriff Michael Cazes and Deputies Bouquet and Jester. They asserted two causes of action: (1) a claim under 42 U.S.C. § 1983 for violation of Tres' Fourteenth Amendment substantive due process rights and (2) a state-law claim for negligence. The district court granted summary judgment in favor of the Defendants. The O'Neals now appeal.

## II. STANDARD OF REVIEW

We review the district court's grant of summary judgment de novo, applying the same standard as the district court. Atkins v. Hibernia Corp., 182 F.3d 320, 323 (5th Cir. 1999). Summary judgment is appropriate when the record establishes "that there is no genuine issue as to any material fact and

that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Where the non-movant bears the burden of proof at trial, as is the case here, the movant need only demonstrate that the non-movant has insufficient evidence of an essential element of its case. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Although courts must consider the evidence in the light most favorable to the non-movant, the non-movant must produce more than "conclusory allegations," "unsubstantiated assertions," and "a scintilla of evidence." Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (citations omitted). Rather, the non-movant must produce "sufficient evidence . . . for a jury to return a verdict [in its favor]." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

III. DISCUSSION

A. Section 1983 Claim

The O'Neals brought their federal claims under 42 U.S.C. § 1983, seeking damages for an alleged violation of Tres O'Neal's due process rights. Section 1983 provides for the recovery of damages when individuals are deprived of their constitutional rights by a person acting under color of state law. Public officials, however, are afforded immunity from civil damages for their discretionary acts so long as their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In deciding whether a public official is entitled to qualified immunity, a court "must first determine whether the officer's alleged conduct violated a constitutional right." Chavez v. Martinez, 538 U.S. 760, 766 (2003).

In County of Sacramento v. Lewis, the Supreme Court laid out the standards to be applied in determining whether a police pursuit resulting in harm violates the injured party's substantive due process rights. 523 U.S. 833 (1998). The Court stated that the "touchstone of the due process clause is

5

protection of the individual against arbitrary action of government," id. at 845, and that with respect to abusive executive action, only "conscience shocking" or "the most egregious official conduct" is so arbitrary as to violate due process. Id. at 846-47 & n.8 ("[I]n a due process challenge to executive action, the threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.").

The Court makes clear that due process does not "impos[e] liability whenever someone cloaked with state authority causes harm" and that "negligently inflicted harm is categorically beneath the threshold of constitutional due process." Id. at 848-49. In addition, the Court held that in the context of high-speed police chases, even deliberate indifference or recklessness would be insufficient to state a claim under the due process clause. Id. at 852-53. Accordingly, the Court held that "high-speed chases with no intent to harm suspects physically or to worsen their legal plight do not give rise to liability under the Fourteenth Amendment, redressible by an action under § 1983." Id. at 854.

The O'Neals concede that there is no proof that Bouquet intended to harm Tres but argue that the district court erred in granting summary judgment on this claim without considering their theory, cognizable under Lewis, that Deputy Bouquet's high-speed pursuit of Tres "worsen[ed Tres'] legal plight" or constituted an intentional misuse of his police vehicle. 523 U.S. at 854 & n.13.[2] However, whatever the Supreme Court meant by "worsen their legal plight," it is clear that Bouquet was far from crossing the "constitutional line," Checki v. Webb, 785 F.2d 534, 538 (1986), as he was engaged in legitimate law

---

[2] The Lewis Court cites the Fifth Circuit's opinion in Checki v. Webb to stand for the proposition that although a plaintiff cannot maintain a § 1983 claim "[w]here a citizen suffers physical injury due to a police officer's negligent use of his vehicle, . . . . [i]t is a different story when a citizen suffers or is seriously threatened with physical injury due to a police officer's intentional misuse of his vehicle." 785 F.2d 534, 538 (1986) (emphasis in original).

enforcement activity regarding the events concerning the mystery vehicle.[3] Bouquet received a report of a suspicious vehicle repeatedly driving up and down a street and waiting in front of a residence, and he sought to identify whether the vehicle he saw on Elm Grove Road matched the description of the suspicious vehicle. This is certainly legitimate law enforcement activity.[4]

Appellants assert that Deputy Bouquet's version of events is untrue. First, Appellants contend that Bouquet knew or should have known that Tres was the driver of the mystery vehicle, and, therefore, Bouquet's purpose in his pursuit was not to identify the mystery vehicle. There is simply no evidence that Bouquet knew the driver was Tres. Bouquet readily admits that he suspected that the driver was Tres; however, Bouquet's attempt to confirm this suspicion still constitutes legitimate law enforcement activity.

Second, Appellants contend that, contrary to Bouquet's direct testimony, Bouquet actually initiated the pursuit. However, even if Bouquet did initiate the pursuit and even if such pursuit was careless and ill-advised, these facts do not transform Bouquet's purpose into an illegitimate or arbitrary one–he still sought to confirm the identity of a suspicious vehicle, an act well within the realm of legitimate law enforcement.[5]

Finally, Appellants exert substantial effort in an attempt to show that Deputy Bouquet and his version of events are not credible and that this lack of

---

[3] Both Lewis and Checki distinguish between legitimate exercises of authority that clearly do not cross the "constitutional line" and conduct that is "malicious[] and sadistic[]," Lewis, 523 U.S. at 853, or a "malicious abuse of official power." Checki, 785 F.2d at 538.

[4] Appellants contend that Bouquet's actions were outside the scope of his law enforcement duties because Bouquet was simply trying to satisfy the personal requests of a fellow deputy, Chad Jester, to increase his patrols in the area. However, the fact that the person who called in the report, Rodney Adams, had some relation to the deputy who asked Bouquet to patrol the area does not somehow remove Bouquet's activity from the realm of legitimate law enforcement.

[5] Additionally, as discussed in Section III.B infra, Appellants produced insufficient evidence to show that Deputy Bouquet did anything to cause the mystery vehicle to flee.

credibility should have precluded a ruling in favor of Appellees on summary judgment. Appellants are correct in asserting that summary judgment is inappropriate "when questions about the credibility of key witnesses loom . . . large." Thomas v. Great Atlantic & Pacific Tea Co., 233 F.3d 326, 331 (5th Cir. 2000); see also Aujla v. Hinds County, Miss., No. 01-60699, 2003 WL 1098839, at *3-4 (5th Cir. Feb. 11, 2003) (unpublished).

In the case at hand, however, Appellants' evidence challenging Bouquet's credibility does not cast sufficient doubt on the veracity of Bouquet's version of events. Appellants point to minor inconsistencies in Bouquet's testimony; Bouquet's inability to remember precise distances and times almost two years after the events in question; the fact that Bouquet's attempt to intercept the mystery vehicle at the cut-off point would have been ill-advised; and the testimony of Rodney Adams about the time he received an alleged telephone call, where Adams admits that his memory is poor. Given that Appellants have offered no evidence contradicting Bouquet's version of events, Appellants' showing does not cause the credibility of Bouquet to "loom large."

Quite simply, Appellants' version of events–that Bouquet knew Tres was the driver of the mystery vehicle and chased Tres until he crashed–is mere speculation and conjecture, unsupported by the summary judgment evidence; therefore, Appellants cannot survive summary judgment on their Section 1983 claim. See Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (stating that where the non-movant has the burden of proof at trial, it must produce more than "conclusory allegations," "unsubstantiated assertions," and "a scintilla of evidence" in order to survive a motion for summary judgment).

B. State Law Negligence Claim

The O'Neals allege that the district court erred in concluding that no evidence supported their negligence claim. Under Louisiana law, for a

defendant to be held liable under a theory of negligence, a plaintiff must prove five separate elements:

> (1) the defendant had a duty to conform his or her conduct to a specific standard of care . . . ; (2) the defendant failed to conform his or her conduct to the appropriate standard . . . ; (3) the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries . . . ; (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries . . . ; and (5) actual damages . . . .

Mathieu v. Imperial Toy Corp., 646 So. 2d 318, 322 (La. 1994).

In the case at hand, the district court was correct in finding that Appellants failed to produce sufficient evidence regarding causation. Bouquet testified that after he passed the mystery vehicle, turned around, and made it to the intersection of Elm Grove Road and Section Road, the mystery vehicle was gone, and all he could see were break lights. Bouquet then attempted to catch up to the vehicle to identify it, but he never got anywhere close to the vehicle. There is simply no evidence to suggest that Bouquet took any action that could have possibly caused the mystery vehicle to flee in such a manner.[6]

Because Appellants' negligence claim against Deputy Bouquet fails, Sheriff Cazes is not liable under the theory of respondeat superior. See Franklin v. Haughton Timber Co., 377 So. 2d 400, 405-06 (La. Ct. App. 1979). Similarly, Appellants cannot maintain their claim against Sheriff Cazes for the negligent hiring and training of Deputy Bouquet.

C. The O'Neals' Motion To Extend The Deadline For Expert Reports

---

[6] Appellants posit that "something" had to cause a law-abiding motorist (the vehicle stopped at the stop sign and turned on its blinker at the intersection of Elm Grove and Section Road) to become a fleeing motorist. It is mere speculation, however, that Bouquet caused the vehicle to flee. It is entirely consistent with this evidence that the driver of the mystery vehicle saw the police car when they passed each other on Elm Grove Road, saw the police car turn around, stopped at the stop sign, and then fled at a high rate of speed once he was out of sight.

Appellants also attack Bouquet's credibility, and, if such attacks were successful, then Appellants would survive summary judgment on their negligence claim as well. As explained in Section III.A supra, however, Bouquet's credibility remains intact.

Appellants assert that the district court erred by refusing to consider their expert reports on summary judgment due to Appellants' failure to meet allegedly unreasonable scheduling deadlines.

On May 10, 2005, the magistrate judge issued a scheduling order establishing the following deadlines: Appellants' witness list (including experts) due on July 29, 2005; discovery to be completed by August 31, 2005; Appellants' expert reports due on September 30, 2005; and Appellees' witness list and expert reports due on October 31, 2005. Appellants timely provided a witness list in the form of preliminary disclosures, listing only one proposed expert witness–A.J. McPhate, an expert in accident reconstruction. Hurricane Katrina struck on August 29, 2005. Because of the hurricane, on November 2, 2005, the magistrate judge extended the deadline for discovery to November 30, 2005, the deadline for Appellees' witness list and Appellants' expert reports to December 30, 2005, and the deadline for Appellees' expert reports to January 31, 2006. Appellants thereafter sought a further extension of the deadlines in the scheduling order, and, on November 30, 2005, the magistrate judge extended the deadline for discovery to December 30, 2005. The magistrate judge warned in bold type: "These deadlines will not be extended again." The deadline for Appellants' expert reports remained December 30, 2005.

Despite these deadlines, the O'Neals filed an "expert witness list" on January 3, 2006, naming W. Lloyd Grafton as their law enforcement expert, along with other previously unidentified experts. Furthermore, on the same date, the O'Neals requested another extension for their expert reports, arguing that they had just completed discovery and had not had sufficient time to provide the discovery materials to their experts for them to generate their required reports. The magistrate judge denied this motion. On January 6, 2006, Appellants filed what they termed "Rule 72 Objections to Magistrate's Denial to Extend Discovery Deadlines and Motion for Reconsideration." Treating this as

a motion for reconsideration, the magistrate judge denied it. Appellants nonetheless submitted the expert reports of McPhate and Grafton with their "Memorandum in Opposition to Motion for Summary Judgment." The district court refused to consider this evidence in its summary judgment ruling.

The district court's decision to "exclude evidence as a means of enforcing a pretrial order 'must not be disturbed' absent a clear abuse of discretion." Geiserman v. MacDonald, 893 F.2d 787, 790 (5th Cir. 1990) (citation omitted). In determining whether the district court abused its discretion, we consider four factors: "(1) the explanation for the failure to [comply with the scheduling order]; (2) the importance of the testimony; (3) potential prejudice in allowing the testimony; and (4) the availability of a continuance to cure such prejudice." Id. at 791.

The O'Neals' explanation for their failure to comply with the scheduling order is weak. First, with respect to their failure to timely identify Grafton as an expert witness, Appellants assert that they thought the July 29 deadline to submit their witness list was a mistake. Appellants, however, never objected to or sought clarification of the order; they simply ignored it until it was too late. Second, with respect to their failure to timely produce McPhate's expert report, Appellants assert that McPhate could not render his opinion until they deposed Deputy Kenny Albarez—the officer in charge of investigating the accident. McPhate indicates in his report, however, that he did not rely on this deposition, instead relying on depositions and evidence available to Appellants prior to May 2005.

Further, the proposed expert testimony is not important enough to warrant its allowance. Neither report furnishes sufficient evidence contradicting

Bouquet's version of events, especially with respect to his testimony that he did nothing to initiate the high-speed pursuit.[7]

Therefore, even if the admission of the expert reports would not have caused Appellees any prejudice, we cannot say that the district court abused its discretion in excluding them.

D.  The O'Neals' Rule 72 Objections And Motion For Reconsideration

Appellants additionally contend that reversible error occurred when the magistrate judge, rather than the district court, ruled on their Rule 72 objections.  Although Appellants are likely correct that the district court should have decided the Rule 72 objection,[8] Appellants have not established that the magistrate judge's order to which they were objecting was "clearly erroneous or contrary to law."  Fed. R. Civ. P. 72(a).  Accordingly, any error is not reversible.

IV.  CONCLUSION

For the foregoing reasons, the order of the district court is AFFIRMED.

---

[7] McPhate's report states that Bouquet's claim that the Sable outran his police car seems "improbable."  While this provides some circumstantial evidence that Bouquet's version of events is suspect, this evidence is too weak to conclude that the district court abused its discretion by disallowing admission of McPhate's report.

[8] Rule 72(a) provides: "Within 10 days after being served with a copy of the magistrate judge's order, a party may serve and file objections to the order . . . .  The district judge to whom the case is assigned shall consider such objections and shall modify or set aside any portion of the magistrate judge's order found to be clearly erroneous or contrary to law."  Fed. R. Civ. P. 72(a) (emphasis added).