DAVID J. ANDERSON, APPELLEE, v. ROBERT HOUSTON, DIRECTOR, NEBRASKA DEPARTMENT OF CORRECTIONAL SERVICES, APPELLANT.

744 N.W.2d 410

Filed February 1, 2008. Nos. S-05-1561, S-06-206.

Jon Bruning, Attorney General, Kimberley Taylor-Riley, and Ryan Gilbride for appellant.

Michael D. Nelson and Cathy R. Saathoff, of Nelson Law, L.L.C., and April L. O'Loughlin, of O'Loughlin Law, P.C., for appellee.

HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

HEAVICAN, C.J.

## I. INTRODUCTION

David J. Anderson, an inmate at the Nebraska State Penitentiary in Lancaster County, filed a writ of habeas corpus in the district court for Douglas County. In his writ, Anderson requested sentence credit for time he spent at liberty after the Nebraska Department of Correctional Services (Department) mistakenly released Anderson long before his sentences were to expire. After concluding that it had jurisdiction over the matter, the district court granted Anderson's writ. The Department appealed and also filed a petition to bypass the Nebraska Court of Appeals, which we granted. We reverse, and remand for reasons set forth below. We also vacate the district court's orders for related legal fees and costs.

## II. BACKGROUND

Anderson was convicted in Douglas County District Court of a Class III felony, theft by unlawful taking, and a Class IV felony, theft by unlawful taking. The court sentenced Anderson to 3 to 5 years' imprisonment for the Class III felony and 20 months' to 5 years' imprisonment for the Class IV felony. The court ordered the sentences to run concurrently.

On July 8, 2003, the Department mistakenly released Anderson from incarceration a mere 3 months into his sentence. If Anderson had remained in custody, he would have been eligible for parole on July 14, 2004, with a mandatory release date of July 14, 2005. The Department eventually discovered its mistake and, on September 16, 2003, filed a motion for capias and notice of hearing in the Douglas County District Court. The record is unclear, however, whether notice of this hearing was sent to Anderson, nor is it clear whether he received it. Anderson claims he did not receive the notice. Either way, Anderson did not appear at the hearing scheduled for September 24. That same day, the district court issued an order directing any law enforcement officers to arrest Anderson if they located him. Although the record does not explain why, the clerk's office did not issue that warrant for approximately 14 months.

In the interim, however, Douglas County filed a motion for declaration of forfeiture of Anderson's bail bond for the reason that Anderson failed to appear at the September 24, 2003, hearing. This motion, which was filed on March 17, 2004, and an accompanying letter were mailed to Anderson at an address specified in the certificate of service. Had Anderson received these documents, he certainly would have had reason to believe that something was amiss with his status as a released prisoner. It is not clear, however, where the county obtained that address or whether the address was, in fact, accurate. On March 26, the court entered a default judgment forfeiting Anderson's bond.

On January 3, 2005, a little more than 9 months after the bond forfeiture proceeding, police arrested Anderson during a routine traffic stop. Anderson was then returned to the Nebraska State Penitentiary in Lancaster County. After accounting for the time Anderson was absent from prison, the Department found that his

recalculated parole eligibility date was January 9, 2006, and that his new mandatory release date was January 9, 2007.

Anderson then filed a writ of habeas corpus in Douglas County District Court. At the initial hearing, the Department waived any objection to jurisdiction in Douglas County. Anderson was then transported from the state penitentiary to the Douglas County Correctional Center by the Douglas County sheriff. Sometime later, however, the Department attempted to quash Anderson's habeas corpus petition on the ground that the Douglas County District Court lacked subject matter jurisdiction. After an evidentiary hearing, the district court concluded that it had jurisdiction. This conclusion was based on *Gillard v. Clark*,[1] which the district court read as standing for the proposition that jurisdiction in habeas proceedings can effectively be transferred from one county to another. The district court noted that the Department waived jurisdiction at the initial hearing and therefore concluded that jurisdiction was proper in Douglas County.

The court then held an evidentiary hearing to address the merits of Anderson's underlying habeas claim. Here, the court cited our decision in *State v. Texel*,[2] in which we held that prisoners must serve their sentences continuously and therefore may not consent to serving sentences intermittently. As a result, the court granted Anderson's writ. In response, the Department filed a notice of appeal, our case No. S-05-1561.

Shortly thereafter, the district court entered two additional orders. In its first order, filed on January 20, 2006, the court granted Anderson's request that the Department pay court costs. Then, in an order filed on February 10, 2006, the court permitted Anderson to withdraw his request that the Department pay his legal fees. The Department appealed these orders, our case No. S-06-206, and filed a petition to bypass the Court of Appeals. We consolidated both appeals for our review.

---

[1] *Gillard v. Clark*, 105 Neb. 84, 179 N.W. 396 (1920).

[2] *State v. Texel*, 230 Neb. 810, 433 N.W.2d 541 (1989).

## III. ASSIGNMENTS OF ERROR

On appeal, the Department assigns that the district court erred by (1) finding that it had subject matter jurisdiction over Anderson's habeas petition, (2) granting habeas corpus relief to Anderson, and (3) entering the January 20 and February 10, 2006, orders after the Department perfected its initial appeal.

## IV. STANDARD OF REVIEW

■ A jurisdictional question that does not involve a factual dispute is determined by an appellate court as a matter of law, which requires the appellate court to reach a conclusion independent of the lower court's decision.[3]

■ It appears that Nebraska case law has not yet expressly identified the exact standard of review on appeal of a habeas petition. Drawing insight from other jurisdictions, we hold that on appeal of a habeas petition, an appellate court reviews the trial court's factual findings for clear error and its conclusions of law de novo.[4]

## V. ANALYSIS

We think it prudent to address the arguments in the order in which they were presented to us. Accordingly, we begin our analysis by addressing whether the district court had jurisdiction and then consider the Department's claim that Anderson was not entitled to habeas relief. We conclude our analysis by addressing the orders of the district court issued after the Department's notice of appeal.

### 1. JURISDICTIONAL QUESTION

■ The Department claims that the district court for Douglas County did not have subject matter jurisdiction over Anderson's habeas petition because Anderson was confined in Lancaster County. It is well established that if the court from which an appeal was taken lacked jurisdiction, the appellate court acquires no jurisdiction.[5] Thus, if the district court lacked jurisdiction to

---

[3] *State v. Loyd*, 269 Neb. 762, 696 N.W.2d 860 (2005).

[4] See *Garcia v. Mathes*, 474 F.3d 1014 (8th Cir. 2007).

[5] *State v. Jacques*, 253 Neb. 247, 570 N.W.2d 331 (1997).

entertain Anderson's habeas petition, we, too, would have no jurisdiction to review the merits of Anderson's petition.

■ Before we proceed to the substance of the jurisdictional issue, we pause to note our belief that the Department may have misspoken when it fashioned its argument. The argument that the case should have been brought in the district court for Lancaster County as opposed to the district court for Douglas County is perhaps a challenge to venue rather than subject matter jurisdiction. The difference is significant. For one, litigants cannot confer subject matter jurisdiction upon a tribunal by acquiescence or consent.[6] In contrast, venue provisions confer a personal privilege which may be waived by the defendant.[7]

■ In addition, we think it clear that the Douglas County District Court had subject matter jurisdiction in this case. Under Nebraska law, an application for habeas relief may be made to "*any* one of the judges of the district court, or to any county judge."[8] Because "any" district judge obviously includes the district court for Douglas County, it is beyond dispute that the district court for Douglas County had subject matter jurisdiction over Anderson's habeas claim.

■ But while the above language makes clear that any and all district courts in Nebraska have subject matter jurisdiction over habeas claims, it does not identify *which county's* district courts may hear habeas claims. This issue—essentially a question of venue—is the issue which lies at the heart of the Department's argument. To resolve that question, we turn to *Gillard*,[9] in which this court held that

> an application for a writ of habeas corpus to release a prisoner confined under sentence of court must be brought in the county where the prisoner is confined. [Citation omitted.] And where proceedings are instituted in another

---

[6] *Muir v. Nebraska Dept. of Motor Vehicles*, 260 Neb. 450, 618 N.W.2d 444 (2000) (citing *Hagelstein v. Swift-Eckrich*, 257 Neb. 312, 597 N.W.2d 394 (1999)).

[7] *Id.*

[8] Neb. Rev. Stat. § 29-2801 (Reissue 1995) (emphasis supplied).

[9] *Gillard, supra* note 1, 105 Neb. at 87, 179 N.W. at 398. See, also, *Addison v. Parratt*, 204 Neb. 656, 284 N.W.2d 574 (1979).

county, it is the duty of the court, on objection to its jurisdiction, to dismiss the proceedings.

Relying on *Gillard*, the Department points out that Anderson was confined in the Nebraska State Penitentiary in Lancaster County, yet sought habeas relief in the district court for Douglas County. In effect, the Department appears to suggest that the district court for Douglas County was not the proper venue to litigate the merits of Anderson's habeas claim.

 While the Department would be correct under *Gillard*'s general rule, other language in *Gillard* provided for a narrow exception:

> [W]here application is made for a writ of habeas corpus to the d[i]strict court of a county other than that in which the prisoner is confined, and the officer in whose custody the prisoner is held brings the latter into court and submits to the jurisdiction without objection, the prisoner is then under confinement in the county where the action is brought, and the court has authority to inquire into the legality of his restraint.[10]

We believe this exception applies here. Although Anderson filed his habeas petition in Douglas County—a county other than the one in which he was confined—Anderson was later transferred to the Douglas County Correctional Center. Moreover, the Department submitted to the court's "jurisdiction" at the initial hearing by failing to object to venue in Douglas County. As such, Anderson was under confinement in Douglas County. The Douglas County District Court therefore had authority to consider the legality of Anderson's restraint.

### 2. ANDERSON'S CLAIM FOR HABEAS RELIEF

 Having resolved that the district court had jurisdiction over Anderson's habeas claim, we turn now to address the merits of the habeas claim itself. The habeas corpus writ provides illegally detained prisoners with a mechanism for challenging the legality of a custodial deprivation of liberty.[11] To secure habeas corpus relief, the prisoner must show that he

---

[10] *Gillard, supra* note 1, 105 Neb. at 87, 179 N.W. at 398.

[11] See *Tyler v. Houston*, 273 Neb. 100, 728 N.W.2d 549 (2007).

or she is being illegally detained and is entitled to the benefits of the writ.[12]

Anderson argues that he is entitled to day-for-day credit toward his sentence for the time that he, an erroneously released prisoner, spent at liberty. Anderson essentially believes that his sentence continued to run from July 8, 2003, the date of erroneous release, to January 3, 2005, the date he was picked up by officers, as though he were in prison the entire time. Therefore, Anderson believes the Department was obligated to release him no later than July 14, 2005, the date his sentence was originally set to expire, and that detaining him beyond that date was illegal.[13]

In making this argument, Anderson invokes a line of cases under which erroneously released prisoners received sentence credit based on the belief that prematurely releasing and then reincarcerating a prisoner impermissibly interferes with the prisoner's right to expeditiously pay his or her debt to society.[14] We review this authority immediately below, then address what impact it may have on the present case in a subsequent section.

(a) Theories Permitting Relief to
Prematurely Released Prisoners

As set forth in the seminal case of *White v. Pearlman*,[15] a prisoner's "chance to re-establish himself and live down his past" is frustrated if the prisoner is prevented from serving his sentence continuously. This is because "a prisoner sentenced to five years might be released in a year; picked up a year later to serve three months, and so on ad libitum, with the result that he is left without even a hope of beating his way back."[16] Therefore, on the theory that the government should not be "permitted to

---

[12] See *id.*

[13] See *Piercy v. Parratt*, 202 Neb. 102, 273 N.W.2d 689 (1979).

[14] See, *In re Roach*, 150 Wash. 2d 29, 74 P.3d 134 (2003) (collecting cases); Gabriel J. Chin, *Getting out of Jail Free: Sentence Credit for Periods of Mistaken Liberty*, 45 Cath. U. L. Rev. 403 (1996) (same).

[15] *White v. Pearlman*, 42 F.2d 788, 789 (10th Cir. 1930).

[16] *Id.*

play cat and mouse with the prisoner, delaying indefinitely the expiation of his debt to society and his reintegration into the free community,"[17] numerous courts now employ various remedies in cases involving interrupted sentences.

Specifically, courts have developed three distinct theories for granting relief to a prematurely released prisoner.[18] The first theory is based on notions of due process and is often called the "waiver-of-jurisdiction theory."[19] It appears that courts apply the waiver-of-jurisdiction theory when the premature release resulted from gross negligence by prison officials and lasted "a long period of time."[20] In such cases, the government is said to have waived its right to reincarcerate the prisoner and thus the remedy is a complete exoneration of the prisoner's sentence.[21] The rationale is that it would be "unequivocally inconsistent with 'fundamental principles of liberty and justice' to require a legal sentence to be served" after such an interruption.[22]

The second theory, devised by the Ninth Circuit, is known as the "estoppel theory" and is also rooted in notions of due process.[23] Under this theory, the government is estopped from reincarcerating the prisoner when a particular set of circumstances are present. Essentially, those circumstances arise when (1) the government knew the facts surrounding the release, (2) the government intended that the prisoner would rely upon its actions or acted in such a manner that the prisoner had a right to rely on them, (3) the prisoner was ignorant of the facts, and (4) the prisoner relied on the government's actions to his or her detriment.[24]

---

[17] *Dunne v. Keohane*, 14 F.3d 335, 336 (7th Cir. 1994).

[18] See, *Tyler, supra* note 11; *In re Roach, supra* note 14.

[19] *Schwichtenberg v. ADOC*, 190 Ariz. 574, 577, 951 P.2d 449, 452 (1997).

[20] *In re Roach, supra* note 14, 150 Wash. 2d at 34, 74 P.3d at 137. See, also, *Schwichtenberg, supra* note 19.

[21] *In re Roach, supra* note 14; *Schwichtenberg, supra* note 19.

[22] *Green v. Christiansen*, 732 F.2d 1397, 1399 (9th Cir. 1984).

[23] *U.S. v. Martinez*, 837 F.2d 861, 865 (9th Cir. 1988). Accord *Schwichtenberg, supra* note 19 (citing *Martinez, supra*).

[24] *Green, supra* note 22.

Notably, a prisoner who knew that his or her release was erroneous cannot claim to have been "ignorant of the facts" and therefore cannot invoke the estoppel theory.[25] Further, because the estoppel theory is rooted in due process, and because a due process challenge to executive action requires behavior that is "egregious [and] outrageous,"[26] the estoppel theory requires some affirmative misconduct by authorities.[27]

The third and final remedy courts use in interrupted-detention cases is to grant a prisoner day-for-day credit for the time spent at liberty.[28] However, numerous federal appellate courts have held that the Due Process Clause does not require credit for the time spent at liberty in cases of an interrupted sentence.[29] Instead, credit for time spent at liberty is a common-law doctrine rooted in equity and is often called the "equitable doctrine."[30] In contrast to the waiver-of-jurisdiction or estoppel theories, a prisoner is eligible for credit under the equitable doctrine when the premature release is due to simple negligence by officials.[31]

By asking for day-for-day credit toward his sentence, Anderson relies solely on the equitable doctrine of credit for time spent at liberty. He does not advance an argument under the waiver-of-jurisdiction or estoppel theories, nor do we find evidence in the record suggesting that the Department committed misconduct rising to the level of a due process violation when it prematurely released Anderson. As such, today's decision focuses solely on whether Anderson is entitled to credit for time spent at liberty under the equitable doctrine.

---

[25] *Martinez, supra* note 23, 837 F.2d at 865.

[26] *County of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8, 118 S. Ct. 1708, 140 L. Ed. 2d 1043 (1998).

[27] *Martinez, supra* note 23.

[28] *Tyler, supra* note 11; *In re Roach, supra* note 14.

[29] See, e.g., *Vega v. U.S.*, 493 F.3d 310 (3d Cir. 2007); *Thompson v. Cockrell*, 263 F.3d 423 (5th Cir. 2001); *Hawkins v. Freeman*, 195 F.3d 732 (4th Cir. 1999); *Dunne, supra* note 17.

[30] *Tyler, supra* note 11, 273 Neb. at 108, 728 N.W.2d at 556. Accord, *In re Roach, supra* note 14; *Schwichtenberg, supra* note 19.

[31] *In re Roach, supra* note 14; *Schwichtenberg, supra* note 19.

For decades, the common-law rule in Nebraska was harsh but simple: Prisoners were not entitled to credit for time spent outside the prison, regardless of the circumstances.[32] The first sign that this longstanding rule might be in jeopardy came in *Texel*.[33] In dicta, the *Texel* court observed that prisoners have the right to serve their sentences in a continuous manner,[34] a conclusion which, as noted above, is universally cited as a reason to provide a remedy in interrupted-sentence cases.[35]

More recently, we had occasion to discuss credit for time spent at liberty in *Tyler v. Houston*.[36] In *Tyler*, a prisoner sought day-for-day credit for time spent out on bond while the state appealed, and ultimately succeeded in overturning, the district court's grant of habeas relief. Although we surveyed court decisions applying the equitable doctrine, we found it unnecessary to formally adopt or reject the doctrine in that case. As we explained, even jurisdictions recognizing the equitable doctrine refused to grant credit for time spent at liberty while the government appeals an adverse habeas ruling.[37]

Resolving Anderson's claim requires that we finally confront questions hinted at in *Texel* and left unresolved in *Tyler*: Are prisoners in Nebraska ever entitled to day-for-day credit for time erroneously spent at liberty under the equitable doctrine, and if so, under what circumstances will such credit be forthcoming? It is to those questions that we now turn.

(b) Variations of the Equitable Doctrine

In considering whether to adopt the equitable doctrine in Nebraska, we note that there are numerous variations to choose from. The Ninth Circuit, for example, simply grants credit for time erroneously spent at liberty so long as the prisoner did

---

[32] See, *Ulrich v. O'Grady*, 136 Neb. 684, 287 N.W. 81 (1939); *Goodman v. O'Grady*, 135 Neb. 612, 283 N.W. 213 (1939); *Mercer v. Fenton*, 120 Neb. 191, 231 N.W. 807 (1930).

[33] *Texel, supra* note 2.

[34] *Id.*

[35] See, e.g., *White, supra* note 15.

[36] *Tyler, supra* note 11.

[37] *Id.* (citing *Hunter v. McDonald*, 159 F.2d 861 (10th Cir. 1947)).

not contribute to his or her release.[38] In so holding, the Ninth Circuit does not take into account whether the prisoner misbehaves while at liberty.[39] Several other courts, however, find that prisoners who "abscond[] legal obligations while at liberty" are not entitled to credit for time spent at liberty under the equitable doctrine.[40]

Similarly, courts recognizing the equitable doctrine disagree about whether to grant credit to prisoners who remained silent when released, even though they knew the release was premature. A few courts, including the Ninth Circuit and Arizona Supreme Court, conclude that such "informed silence" is inconsequential. Those courts grant credit for time spent at liberty even where the prisoner knew the release was erroneous and yet said nothing to authorities.[41] In contrast, several other courts have either denied credit in cases of informed silence[42] or, conversely, granted credit specifically because the prisoner informed officials of the mistake.[43]

The district court in this case specifically found that Anderson did not cause his premature release, nor is there evidence that Anderson committed any crimes while he was erroneously at liberty. However, a legitimate question remains as to whether Anderson knew that his release was premature and yet remained silent.

---

[38] *Martinez, supra* note 23.

[39] See *Schwichtenberg, supra* note 19 (citing *Martinez, supra* note 23).

[40] *Tyler, supra* note 11, 273 Neb. at 109, 728 N.W.2d at 557. See, e.g., *In re Roach, supra* note 14; *Brown v. Brittain*, 773 P.2d 570 (Colo. 1989); *In re Messerschmidt*, 104 Cal. App. 3d 514, 163 Cal. Rptr. 580 (1980).

[41] See, *Martinez, supra* note 23; *Schwichtenberg, supra* note 19. See, also, *Vega, supra* note 29; *People ex rel. Bilotti v. Warden*, 42 A.D.2d 115, 345 N.Y.S.2d 584 (1973).

[42] *Diaz v. Holder*, 136 Fed. Appx. 230 (11th Cir. 2005); *Gaines v. Florida Parole Com'n*, 962 So. 2d 1040 (Fla. App. 2007); *Pugh v. State*, 563 So. 2d 601 (Miss. 1990). See, also, *In re Roach, supra* note 14 (Chambers, J., concurring).

[43] *White, supra* note 15; *United States v. Merritt*, 478 F. Supp. 804 (D.D.C. 1979); *Hartley v. State*, 50 Ala. App. 414, 279 So. 2d 585 (1973) (quoting *White, supra* note 15).

In *Schwichtenberg v. ADOC*,[44] the Arizona Supreme Court addressed whether prisoners who remain in informed silence are entitled to credit under the equitable doctrine. The court framed the issue as whether a prisoner was "at fault" for his premature release simply because he knew the release was erroneous yet said nothing. The court observed that "fault" implies that an individual "refrained from doing that which he had a duty to do."[45] Because a prisoner is "under no legal obligation" to speak up, the court concluded that a prisoner's informed silence should not disqualify him or her for sentence credit under the equitable doctrine.[46]

We believe, however, that credit for time spent at liberty should be unavailable to prisoners who are aware of the error, yet fail to object. A refusal to grant credit for time spent at liberty is not a form of punishment, and therefore, it is irrelevant that prisoners have no legal duty to bring a mistake to the attention of authorities. Rather, "[c]redit for time erroneously at liberty is an equitable doctrine and should be applied only where equity demands its application."[47] Therefore, the conclusion that informed silence disqualifies a prisoner from receiving sentence credit reflects not so much that the prisoner failed to execute a legal duty, but that such behavior renders the prisoner ineligible for equitable relief.

That certain behavior might prevent a prisoner from invoking the equitable doctrine is not a novel concept. Indeed, as noted above, numerous courts believe that it would offend notions of equity to credit a prisoner for time erroneously spent at liberty if the individual spent that time committing additional crimes. We believe similar considerations ought to apply as to how a prisoner handles the prospect of being released prematurely.

It has been said, both here and elsewhere, that two rights are served by the equitable doctrine. The first right is society's "right to expect that once a defendant has been incarcerated, the

---

[44] *Schwichtenberg, supra* note 19.

[45] *Id.* at 579, 951 P.2d at 454.

[46] *Id.*

[47] *In re Roach, supra* note 14, 150 Wash. 2d at 38, 74 P.3d at 139 (Chambers, J., concurring).

time will not be served in bits and pieces."[48] Of course, it is also true that "[t]hose tried and convicted of crimes owe a debt to society" and that "[s]ociety is entitled to have that debt paid."[49] So whatever society's interest in seeing that the government does not play cat and mouse with prisoners, society has at least as much "interest in knowing that its criminals are serving the punishment to which they have been sentenced, regardless of . . . negligent error attributable to the government."[50]

That leaves us with the other interest served by the equitable doctrine: The right of "a prisoner . . . to pay his debt to society in one stretch, not in bits and pieces."[51] Drawing upon this language, Anderson reminds us that he "had the right to serve his sentence in one single period of incarceration under Nebraska law."[52] Of course, a prisoner who genuinely cherishes his right to a continuous sentence, as Anderson purports to be, should at least "call[] attention to the mistake being made" before being "ejected from the penitentiary."[53]

In contrast, a prisoner who remains in informed silence when erroneously released and then asks for equitable relief upon reincarceration is not truly motivated by the right to a continuous sentence. Rather, such a prisoner is motivated by nothing more than the unsurprising desire to avoid as much jail time as possible. It takes little imagination to see that prisoners who know their release is premature might nevertheless remain silent in the hope that the mistake will go unnoticed by officials. Predictably, when officials discover the mistake, these prisoners try to obtain credit for time spent at large by arguing that the mistaken release—a mistake they declined to point out—deprived them of the right to a continuous sentence. It seems plain to us, however, that the equitable doctrine

---

[48] *Texel, supra* note 2, 230 Neb. at 814, 433 N.W.2d at 544.

[49] *In re Roach, supra* note 14, 150 Wash. 2d at 38, 74 P.3d at 139 (Chambers, J. concurring).

[50] *Com. v. Blair*, 699 A.2d 738, 743 (Pa. Super. 1997). See, also, *Artez v. Mulcrone*, 673 F.2d 1169 (10th Cir. 1982).

[51] *Texel, supra* note 2, 230 Neb. at 814, 433 N.W.2d at 544.

[52] Brief for appellee at 9.

[53] See *White, supra* note 15, 42 F.2d at 789.

was not meant to encourage such a blatant attempt to game the system.

 Like a majority of courts, we agree that no equitable relief is required where a prisoner causes his or her own premature release from prison, thwarts governmental attempts at recapture, or misbehaves while at liberty. But we also believe that "[w]here it is clear that a prisoner had knowledge of a government mistake and made no effort to correct it, equity does not demand credit for time at liberty."[54] As such, we hold that prisoners who had knowledge of a governmental mistake and yet made no effort to correct it—like prisoners who actively cause or prolong a premature release or commit crimes while at liberty—do not deserve sentence credit under the equitable doctrine. Such a prisoner has essentially acquiesced in the loss of his or her right to a continuous sentence.

 To preserve the right to credit for time spent at liberty, a prisoner who knows his or her release is erroneous must make a reasonable attempt to notify authorities of the mistake. Although the prisoner need not "continue to badger the authorities," a reasonable attempt may well include voicing an objection at the time of release or contacting authorities a short time later in order to clarify his or her status.[55]

Having determined that informed silence disqualifies a prisoner from receiving credit for time spent at liberty, we next address how lower courts should determine whether the prisoner knew that the release was, in fact, premature. It has been argued elsewhere that determining whether a prisoner knew the release was premature would be "difficult or impossible."[56] The argument is that the complex nature of modern sentencing schemes would make it difficult for prisoners to identify a precise release date and therefore recognize that they are being released prematurely.[57]

---

[54] See *In re Roach, supra* note 14, 150 Wash. 2d at 39-40, 74 P.3d at 139 (Chambers, J., concurring).

[55] *Merritt, supra* note 43, 478 F. Supp. at 807.

[56] *Schwichtenberg, supra* note 19, 190 Ariz. at 579, 951 P.2d at 454.

[57] See *id.* See, also, *In re Roach, supra* note 14 (Chambers, J., concurring).

In responding to these concerns, we note that "[a]mong our most cherished rights, as American citizens, are the freedom of choice as to our movements, to be free to go where and when we wish, and the right to control and use our worldly possessions as we see fit."[58] Given the significance of those interests, we believe that unless the sentence has been extensively modified by things such as earned release time, work release, or a commutation, a prisoner ought to know the date of his or her release with some precision. We therefore hold that the prisoner carries the burden to show that the complexity in calculating his or her release date, or some cognitive deficiency, prevented him or her from realizing the release was premature. At the same time, the government has what essentially amounts to a burden of production to provide the prisoner with any and all records relevant to this inquiry. Such records would include any copies of the original sentencing order, as well as any records related to earned release time, work release, commutations, and any other such materials.

The record in this case does not conclusively resolve whether Anderson tried to inform officials that his release was premature. We therefore find it necessary to remand this cause for the trial court to determine whether Anderson tried to inform officials of their mistake and, if not, whether Anderson reasonably did not know his sentence was set to expire.

On remand, the district court is directed to make findings regarding the circumstances surrounding the 14-month lag from the date the district court authorized Anderson's recapture and the date the warrant was actually issued. Specifically, the district court is to determine whether Anderson had or should have had notice of the September 24, 2003, hearing on the Department's motion for capias. The parties should also present evidence with regard to Douglas County's motion to declare a forfeiture of Anderson's bond. If notice of either hearing was mailed to Anderson's residence, it could be evidence that Anderson knew his release was premature from that point forward. We reemphasize that the Department has a duty to provide any records and documents that may be relevant to this inquiry.

---

[58] *Boockholdt v. Brown*, 224 Ga. 737, 739, 164 S.E.2d 836, 838 (1968).

On remand, the parties should also present evidence as to why the arrest warrant for Anderson was not issued immediately after it was authorized by the district judge on September 24, 2003. Since the Department has a responsibility to provide any records relevant to this issue, the district court's inquiry in this regard should include a determination as to whether the delay was the part of an organized and diligent plan to notify, find, and reapprehend Anderson, or was instead the product of misconduct—negligent or affirmative—by public officials. If the latter, the district court shall determine what impact, if any, this should have on the equities of denying Anderson credit for any or all of the 14 months after the warrant was authorized, but before it was issued. Obviously, this equitable analysis should be conducted in a manner consistent with the rationale and policies expressed in this opinion.

### 3. PROPRIETY OF ORDERS FOLLOWING DEPARTMENT'S NOTICE OF APPEAL

The only issue remaining for our resolution is whether the district court exceeded its authority when it issued orders granting Anderson's request for payment of court costs and granting Anderson's motion to withdraw a prior request for legal fees. To refresh, these orders, filed on January 20 and February 10, 2006, respectively, were issued *after* the Department had already filed notice of its intent to appeal the district court's decision to grant Anderson habeas relief.

It is well settled that a trial court is divested of jurisdiction when a party perfects appeal of a final order.[59] The question here is whether an order granting habeas relief to the petitioner qualifies as a final order. Anderson argues that the order granting the writ of habeas corpus was not a final order because there were still matters left for the court to resolve. The Department argues the district court's order granting Anderson habeas relief was the final, appealable order. We agree.

[59] See, *Billups v. Scott*, 253 Neb. 293, 571 N.W.2d 607 (1997); *McLaughlin v. Hellbusch*, 251 Neb. 389, 557 N.W.2d 657 (1997); *WBE Co. v. Papio-Missouri River Nat. Resources Dist.*, 247 Neb. 522, 529 N.W.2d 21 (1995).

 Long ago, this court held that "[t]he test of finality for the purpose of an appeal in a habeas corpus proceeding is not necessarily whether the whole matter involved in the action is concluded, but whether the particular proceeding or action is terminated by the judgment."[60] We have previously held that an order denying habeas corpus relief qualifies as a final order.[61] Therefore we hold that an order granting habeas relief also qualifies as a final order. As such, the district court was divested of jurisdiction when the Department perfected its appeal of the district court's order granting Anderson's petition for habeas relief. We therefore vacate the orders filed January 20 and February 10, 2006, for lack of jurisdiction.

## VI. CONCLUSION

We conclude that the Douglas County District Court had jurisdiction over Anderson's habeas petition. Anderson was confined in Douglas County at the time of the initial hearing in this case, and the Department waived jurisdiction at the initial hearing.

We further conclude that the district court erred in granting Anderson's habeas claim. The equitable doctrine of sentence credit for time spent at liberty should not apply in cases where the prisoner (1) caused or prolonged the premature release, (2) committed crimes while at liberty, or (3) knew the release was premature yet failed to bring the mistake to the government's attention. Because we cannot determine, based on this record, whether Anderson attempted to inform authorities of their mistake, we find it necessary to remand the cause to the district court. On remand, the court is to determine whether Anderson made a reasonable attempt to inform authorities of their mistake and, if not, whether Anderson legitimately did not know his release was premature. As expressed above, the court is also directed to make factual findings and conclusions regarding the circumstances surrounding the 14-month period between the

---

[60] *In re Application of Tail, Tail v. Olson,* 144 Neb. 820, 825, 14 N.W.2d 840, 843 (1944).

[61] *Olson, supra* note 60.

time the district court authorized an arrest warrant for Anderson and when it was issued.

Finally, we hold that the district court lacked jurisdiction when it issued two orders after the Department perfected its appeal of the court's decision to grant Anderson's petition. Accordingly, those orders are hereby vacated.

JUDGMENT IN No. S-05-1561 REVERSED, AND
CAUSE REMANDED FOR FURTHER PROCEEDINGS.
JUDGMENT IN No. S-06-206 VACATED.

CONNOLLY and GERRARD, JJ., concur in the result.

WRIGHT, J., concurring.

I concur. The issue is whether Anderson is entitled to credit for time spent at liberty as a result of being prematurely released. This is an equitable doctrine.

If the prisoner is obligated to notify the proper authority when he knows his release was premature, the State has an obligation to act when it discovers the error. The State is permitted one error, but not two.

The Department discovered its mistake and sought a warrant in Douglas County District Court. The court signed the warrant, but the clerk's office did not issue the warrant for approximately 14 months.

When considering what is fair, the State cannot be twice negligent at the prisoner's expense. Once the State discovered the premature release, it had a duty to act promptly.

If the State cannot establish a valid reason why the warrant was not issued immediately after it was signed by the court, Anderson should be entitled to credit for the time the State knowingly failed to act. There is no evidence that Anderson caused his premature release, nor is there evidence that he committed any crimes while he was at liberty. Equity must shine on both sides of the coin.